*In re* MARK FLOYD, Asserted to be a Person Subject to the Administration of Psychotropic Medication (The People of the State of Illinois, Petitioner-Appellee, v. Mark Floyd, Respondent-Appellant).

Fifth District   No. 5—94—0162

Opinion filed August 30, 1995.

Penelope S. Karnes, Jeff M. Plesko, and John B. Lower, all of Guardianship and Advocacy Commission, of Anna, for appellant.

H. Wesley Wilkins, State's Attorney, of Jonesboro (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Respondent, Mark Floyd, appeals from an order of the circuit court of Union County granting a petition to authorize "blood work to safely monitor the administration of psychotropic medication." The trial court found respondent's refusal to allow the withdrawal of his blood for testing in order to ensure a safe dosage of the psychotropic medication analogous to a refusal to receive psychotropic medication. In this cause, respondent contends that (1) the order authorizing the involuntary withdrawal of blood is void for want of statutory authority, (2) the construction of section 2—107.1 of the Mental Health and Developmental Disabilities Code (the Code) (405 ILCS 5/2—107.1 (West 1994)) to include authority to involuntarily withdraw blood violates established rules of statutory construction, (3) the order violates the principle that statutes in derogation of the common law must be strictly construed, (4) the Illinois Administrative Code and Department of Mental Health Policy and Procedure Directive 02.06.01.02 do not require blood tests in conjunction with the administration of psychotropic medication, (5) assuming, *arguendo*, that section 2—107.1 of the Code authorizes the involuntary withdrawal of blood, such authorization is an unreasonable search and seizure and a violation of the right to privacy, (6) respondent was not accorded due process of law, and (7) the State failed to prove by clear and convincing evidence all the requisite elements for the entry of an order pursuant to section 2—107.1 of the Code. We affirm.

## I

Respondent was admitted to Choate Mental Health Center (hereinafter Choate) on September 29, 1993, on an emergency basis. On October 7, 1993, a hearing was conducted after which respondent was found subject to an involuntary admission. On December 10, 1993, a

petition to administer psychotropic drugs to respondent was filed and signed by Dr. Ralph H. Eisaman. Dr. Eisaman was respondent's psychiatrist at Choate. The petition alleged that respondent refused to receive psychotropic medication and to allow lab work to be performed and because of this exhibited a deterioration in his ability to function. Counsel was appointed, and a hearing was set for December 30, 1993. A motion to dismiss was filed by respondent, in which respondent alleged that there was no justiciable matter for the court to decide because respondent had been voluntarily accepting psychotropic medication since the date the State's petition was filed. The matter was continued for one week upon the State's motion, and on January 6, 1994, the State's oral motion to withdraw the petition was granted.

A second petition for the administration of psychotropic medication was filed on January 28, 1994. It alleged that respondent again was refusing psychotropic medication and refusing "monitoring by needed blood testing." Counsel was appointed, and a hearing was set for February 17, 1994. On February 17, 1994, respondent's counsel filed an affidavit stating that respondent's medication administration record indicated that he had not refused any psychotropic medication since January 1, 1994. Thereafter, a hearing on the petition was conducted, at which time the trial court inquired as to whether the assistant State's Attorney handling the matter disagreed with the allegation that respondent had not refused to receive any psychotropic medication. The assistant State's Attorney responded he did not dispute that respondent had taken his medication; nevertheless, it was the State's position that there was still a refusal based upon respondent's refusal to allow blood work to be done, which prevented respondent's medication from being increased. Respondent's attorney replied that the petition only requested authority to administer psychotropic medication and that the trial court could not enter an order granting the authority to involuntarily withdraw blood from respondent because the statute under which the petition was filed did not so provide. (See 405 ILCS 5/2—107.1 (West 1994).) Ultimately, the trial court determined that the issue before it was whether respondent could be forced to have blood withdrawn. The trial court noted that if testimony was presented by a physician that a patient cannot be effectively medicated without blood work to ensure the safe administration of the medication, it would be inclined to grant the petition. The State then called its only witness, Dr. Eisaman.

Dr. Eisaman testified that respondent suffers from chronic schizophrenia and also "has a secondary axis diagnosis, ethanol abuse, not in compliance with medical treatment." He stated that respondent

was being treated with the psychotropic drug Navane and was receiving 40 milligrams per day, but that dosage was not helping respondent. Medical records provided in the record indicate that respondent was receiving 60 milligrams of Navane (thiothixene) daily since January 25, 1994. Dr. Eisaman testified that respondent was in Choate from September 29, 1991, through September 14, 1993. After his discharge, respondent was readmitted on September 28, 1993. Dr. Eisaman stated that at the present time respondent was not being treated effectively and that there may be the need to change to other medications. He specifically stated: "We are having trouble getting any sort of reasonable control, and he certainly can't be put in a less restrictive environment. That was a disaster the last time." Dr. Eisaman testified that respondent needed blood work: "Because without monitoring the blood work, I may be endangering the patient. I am giving him the maximum dosage right now that I can, and that is not helping him. And because of that, you know, he is just going to stay here."

Dr. Eisaman explained that all hospitals are different, but he stated: "[It is] commonly accepted that approximately 60 milligrams of [N]avane a day is about the max. I can go to 150 here." Dr. Eisaman related that sometimes with a much larger dosage of medication, he can get the same therapeutic levels, which may be the case with respondent. He wanted to give respondent a higher dosage but needed the blood work in order to establish the level in respondent's blood and, therefore, be able to protect respondent from side effects. Dr. Eisaman testified that respondent repeatedly refused blood tests, but Dr. Eisaman admitted on cross-examination that respondent allowed his blood to be withdrawn on February 7 and February 12, 1994. Dr. Eisaman explained, however, that respondent had previously refused on January 30, February 3, and February 6, 1994. According to Dr. Eisaman, it was not acceptable to draw blood on respondent's timetable, but that it must be done at least weekly in order to effectively monitor the levels. Dr. Eisaman also stated that respondent was drinking too much water, which dilutes respondent's blood levels and causes a failure to obtain "adequate results."

Dr. Eisaman opined that respondent exhibited a deterioration in his ability to function and caused disruptive behavior by threatening to attack and actually attacking the staff at Choate. Dr. Eisaman stated that the possible benefits of psychotropic medication outweighed the risk of harm in this case, and, likewise, the benefits of doing a blood test outweigh the potential harm. In Dr. Eisaman's opinion, respondent lacked the capacity to make a reasoned decision about the medication and blood tests. Dr. Eisaman also testified that

other less restrictive services had been explored and found inappropriate. By increasing respondent's dosage, Dr. Eisaman hoped to stabilize respondent enough so that he could be put in a less structured and restrictive environment, *i.e.*, a nursing home. According to Dr. Eisaman, the last time something less restrictive was attempted, respondent escaped and was gone approximately 14 days, spending at least one night out in the cold.

After Dr. Eisaman finished testifying, the trial court stated:

> "It appears from the testimony that he is receiving medication but not receiving what he should because of his refusal to allow the blood to be taken. For his own protection, they need to take the blood level to see what to administer—what portion or amount of medication to administer."

The trial court then entered an order finding that respondent refused to "allow blood work to safely monitor the administration of psychotropic medication which was a refusal to receive psychotropic medication." The order also contained findings that all of the six elements of section 2—107.1 of the Code were present. The order granted the petition and ordered respondent to receive psychotropic medication and to have blood drawn by the staff at Choate for a period not to exceed 90 days. This appeal followed.

## II

Respondent first contends that the order authorizing the involuntary withdrawal of blood is void for want of statutory authority and cites to *In re Orr* (1988), 176 Ill. App. 3d 498, 531 N.E.2d 64. Along these same lines, respondent also contends that the construction of section 2—107.1 of the Code to include authority to involuntarily withdraw blood violates established rules of statutory construction. We disagree.

In *Orr*, the respondent appealed an order which allowed him to be involuntarily admitted to a mental health facility and authorized the State to administer medication. As part of its opinion, the *Orr* court discussed the extent to which a person involuntarily committed to a mental health facility can refuse care under section 2—107 of the Code. (Ill. Rev. Stat. 1985, ch. 91½, par. 2—107 (now, as amended, 405 ILCS 5/2—107 (West 1994)).) Section 2—107 of the Code provided, in pertinent part:

> "§ 2—107. An adult recipient of services, or, if the recipient is under guardianship, the recipient's guardian, shall be given the opportunity to refuse generally accepted mental health or developmental disability services, including but not limited to medication, unless such services are necessary to prevent the recipient from causing serious harm to himself or others. If such

services are refused, they shall not be given." (Ill. Rev. Stat. 1985, ch. 91½, par. 2—107 (now, as amended, 405 ILCS 5/2—107 (West 1994)).)

The *Orr* court determined that section 2—107 allows a person subject to involuntary admission to refuse medical treatment "unless (1) under the *parens patriae* doctrine he has been adjudged incompetent in a separate proceeding or (2) if an emergency situation exists where the individual poses an *immediate* threat of physical harm to himself or others." (Emphasis in original.) (*Orr*, 176 Ill. App. 3d at 512, 531 N.E.2d at 73.) The *Orr* court determined that neither situation was present in the case before it. First, the *parens patriae* doctrine did not apply because the respondent was not adjudicated either legally or clinically incompetent under the Probate Act of 1975 (Ill. Rev. Stat. 1985, ch. 110½, par. 11a—3 (now 755 ILCS 5/11a—3 (West 1994))). Second, the emergency situation did not exist because the trial court "both exceeded statutory authority and failed to consider important factors and alternatives when it issued the order authorizing the State to forcibly medicate." (*Orr*, 176 Ill. App. 3d at 512, 531 N.E.2d at 73.) The *Orr* court concluded that "[i]nvoluntary mental health patients should not be treated with psychotropic medications on a long-term basis without the patient's informed consent or the consideration of less severe treatment plans." *Orr*, 176 Ill. App. 3d at 514, 531 N.E.2d at 75.

■ *Orr* predates the 1991 enactment of section 2—107.1 of the Code. Section 2—107.1 delineates nonemergency situations and provides a process whereby a recipient of services can be administered psychotropic medication against his will upon a showing of six elements by clear and convincing evidence. Section 2—107.1 provides, in pertinent part:

"§ 2—107.1. Administration of psychotropic medication upon application to a court.

Notwithstanding the provisions of Section 2—107 of this Act, psychotropic medication may be administered to a recipient of services against his will under the standards and procedures of this Section:

* * *

(d) Psychotropic medication shall not be administered to the recipient unless it has been determined by clear and convincing evidence that all of the following factors are present:

(1) That the recipient has a serious mental illness or developmental disability.

(2) That because of said mental illness or developmental disability, the recipient exhibits deterioration of his ability to function, suffering, or threatening or disruptive behavior.

(3) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in paragraph (2) of subsection (d) of this Section or the repeated episodic occurrence of these symptoms.

(4) That the benefits of the psychotropic medication will outweigh the harm.

(5) That the recipient lacks the capacity to make a reasoned decision about the medication.

(6) That other less restrictive services have been explored and found inappropriate." (405 ILCS 5/2—107.1(d)(1), (d)(2), (d)(3), (d)(4), (d)(5), (d)(6) (West 1994).)

Section 2—107.1 also limits orders authorizing involuntary administration of medication to a 90-day interval, although 90-day periods may be authorized "without limitation" provided additional hearings are held in compliance with the provisions of the statute. 405 ILCS 5/2—107.1(e) (West 1994).

A constitutional challenge to section 2—107.1 was presented to, and rejected by, our supreme court in the case of *In re C.E.* (1994), 161 Ill. 2d 200, 641 N.E.2d 345. Our supreme court determined that section 2—107.1 embodies Illinois' significant *parens patriae* interest in providing for persons who suffer from a serious mental illness or development disability and, therefore, lack capacity to make rational decisions concerning their need for medication. (*C.E.*, 161 Ill. 2d at 217, 641 N.E.2d at 353.) Our supreme court found it significant that the provisions of section 2—107.1 are narrowly tailored and provide strict standards that must be satisfied by clear and convincing evidence. 405 ILCS 5/2—107.1(d)(1), (d)(2), (d)(3), (d)(4), (d)(5), (d)(6) (West 1994); *C.E.*, 161 Ill. 2d at 218-19, 641 N.E.2d at 353.

▄ In the present situation, respondent suffers from chronic schizophrenia and was hospitalized in Choate for two years. After a two-week hiatus from Choate, respondent was readmitted for the same condition. At the time of the hearing, respondent was receiving a dosage of Navane which, according to Dr. Eisaman, was not helping. He testified respondent needed blood tests on a weekly basis to determine whether he was receiving a therapeutic level of medication and also to prevent toxicity. The parties agree that on occasion respondent has allowed his blood to be withdrawn, but Dr. Eisaman explained that in order to properly monitor the levels of Navane, the blood work had to be done weekly, on the hospital's timetable, not respondent's. It is clear from Dr. Eisaman's testimony that blood testing is essential to the proper treatment of respondent. Blood tests will assist doctors at Choate to prescribe the proper levels of medication to respondent and ensure that there are no toxic side effects.

The side effects and significant risks of psychotropic medication are well established and need not be reiterated here. (See *Orr*, 176 Ill. App. 3d at 512-13, 531 N.E.2d at 74; *C.E.*, 161 Ill. 2d at 215, 641 N.E.2d at 352.) Suffice it to say that if levels of this drug were not properly monitored and respondent suffered toxic side effects, the doctor prescribing the medication would in all likelihood be found guilty of malpractice.

Respondent makes a strong argument based upon *Orr* that in order to perform a blood test there needs to be a specific statute granting such authority. Specifically, respondent asserts that it is not within our province to exceed the plain language of section 2—107.1 of the Code, but rather it is the function of the General Assembly to amend the statute. However, *Orr* is clearly distinguishable from the case at bar. In *Orr*, the question was whether the respondent could be involuntarily medicated with psychotropic medication, a potentially dangerous proposition, whereas in the instant case, it is a question of whether respondent can be ordered to undergo blood testing, an undertaking which involves virtually no risk, trauma, or pain. (*Schmerber v. California* (1966), 384 U.S. 757, 771, 16 L. Ed. 2d 908, 920, 86 S. Ct. 1826, 1836.) Most importantly, the General Assembly enacted a statute subsequent to *Orr*, section 2—107.1, which allows for the involuntary administration of psychotropic medication, and our supreme court held the statute constitutional pursuant to "this State's significant *parens patriae* interest." *C.E.*, 161 Ill. 2d at 217, 641 N.E.2d at 353.

The concept of *parens patriae* recognizes the State's duty to protect and provide for the well-being of those unable to take care of themselves, including the mentally ill. We agree with the State that to hold as respondent proposes, that a court may order the administration of psychotropic medication but may not order the monitoring of the medication levels in respondent's blood, could in some circumstances, such as the instant situation, render section 2—107.1 of the Code meaningless. In addition to looking to the plain language of a statute, we are required to consider the reason for the law and the evil to be remedied, as well as the purpose to be obtained thereby. (*People v. Alejos* (1983), 97 Ill. 2d 502, 511, 455 N.E.2d 48, 52.) In our view, section 2—107.1 of the Code, which allows for the administration of psychotropic medication, includes the authority to order blood testing to ensure the safe administration of the drug, provided that the requirements of the statute are met by clear and convincing evidence.

### III

■ The third contention raised by respondent is that the order of the trial court violates the principle that statutes in derogation of the common law must be strictly construed. The State responds that section 2—107.1 of the Code is not a statute in derogation of the common law, pointing out that at common law, control over a disabled adult's person and property was vested in the sovereign as *parens patriae* power, and such power is now exercised by the courts. (*In re Estate of Nelson* (1993), 250 Ill. App. 3d 282, 286, 621 N.E.2d 81, 84.) Our supreme court stated in *C.E.* that rather than being in derogation of the common law, section 2—107.1 "bears an important and substantial relationship to the State's interest as *parens patriae*." (*C.E.*, 161 Ill. 2d at 218, 641 N.E.2d at 353.) Under the doctrine of *parens patriae*, we believe that courts have the implied authority to order periodic blood testing to ensure the safe administration of psychotropic drugs.

### IV

Fourth, respondent argues that the Illinois Administrative Code and Department of Mental Health Policy and Procedure Directive 02.06.01.02 (hereinafter Directive 02.06.01.02) do not require blood tests in conjunction with the administration of psychotropic medication. The State first replies that this issue was waived because it was not raised in the trial court. Second, the State replies that neither the Illinois Administrative Code nor Directive 02.06.01.02 overrides a professional determination by a physician or mental health facility that blood tests are required in conjunction with the administration of certain levels of psychotropic medication.

■ The record is clear that respondent failed to question Dr. Eisaman at the hearing about the lack of requirements for blood testing in conjunction with the Illinois Administrative Code or Directive 02.06.01.02. Nevertheless, because the involuntary administration of psychotropic medication involves serious liberty interests (see *C.E.*, 161 Ill. 2d 200, 641 N.E.2d 345), we believe that this issue should be considered pursuant to the doctrine of plain error. *In re Stone* (1989), 178 Ill. App. 3d 1084, 1086-87, 534 N.E.2d 213-14.

It is true that the Department of Mental Health has established the daily average acute treatment doses, as well as daily maximal dose limits. Directive 02.06.01.02(III)(K) indicates that the daily average dose of Navane is 20 to 40 milligrams per day while the maximum daily dose is 150 milligrams per day. Respondent is correct that neither the Administrative Code nor the Department of Mental Health policies and procedures specifically address the issue of blood testing

to safely monitor the administration of Navane; however, we do not agree that this precludes testing. Both the Illinois Administrative Code and Directive 02.06.01.02 provide overall, minimal standards to be followed and recognize that a physician must use his professional judgment in caring for the needs of individual patients. For example, Directive 02.06.01.02 provides, in pertinent part:

"F. *Adjusting Dosages*:

The prescribing physician shall adjust the doses of a psychotropic drug to each individual recipient's need. Since different recipients may require different doses because of variability in metabolism and individual susceptibility to drugs, flexible dose strategies shall be employed to find the optimal dose for a given recipient." (Department of Mental Health Policy and Procedures Directive 02.06.01.02F.)

Accordingly, we believe that a physician's professional judgment that blood tests are necessary to monitor the therapeutic levels of psychotropic medication and avoid toxicity takes precedence.

The fifth argument raised by respondent is, assuming, *arguendo*, that section 2—107.1 of the Code authorizes the involuntary withdrawal of blood, such authorization is an involuntary search and seizure and violates the right to privacy. We disagree.

Our supreme court has refused to consider the issue whether a person has a fundamental constitutional privacy right that encompasses the right to refuse medical treatment. In the case of *C.E.*, our supreme court specifically stated:

"We have previously declined to consider this issue, and also choose not to address the question in this appeal. In *Longeway* [*In re Estate of Longeway* (1989), 133 Ill. 2d 33, 549 N.E.2d 292], this court acknowledged that it '[l]ack[ed] guidance from the [United States] Supreme Court' regarding 'whether Federal privacy guarantees the right to refuse *** medical treatment.' (*Longeway*, 133 Ill. 2d at 44[, 549 N.E.2d at 297].) In addition, '[l]acking a clear expression of intent from the drafters of our 1970 State constitution, we similarly abstain[ed] from expanding the privacy provision of our State constitution to embrace this right. [Citation.]' (*Longeway*, 133 Ill. 2d at 44[, 549 N.E.2d at 297].) We find these observations equally applicable to the present cause, and decline C.E.'s invitation to determine whether there is a Federal or State constitutional right to privacy that encompasses a right to refuse medical treatment." (*C.E.*, 161 Ill. 2d at 212-13, 641 N.E.2d at 351.)

On the other hand, the *C.E.* court found that C.E. possessed a Federal constitutional right to refuse psychotropic medication under the liberty interests recognized in constitutional jurisprudence (*C.E.*, 161

Ill. 2d at 213, 641 N.E.2d at 351). The *C.E.* court found a significant *parens patriae* interest in furthering the treatment of those who are mentally ill and who lack capacity to make reasoned decisions concerning their need for medication. *C.E.*, 161 Ill. 2d at 217-18, 641 N.E.2d at 353.

■ In balancing the patient's fundamental liberty interest in refusing the administration of psychotropic drugs against the State's *parens patriae* interest in providing for persons who lack the capacity to make reasoned decisions concerning their need for medication, our supreme court determined that the State's interest greatly outweighs the patient's liberty interest. (*C.E.*, 161 Ill. 2d at 217-18, 641 N.E.2d at 353.) Relying on *C.E.*, we decline to consider whether respondent has a fundamental constitutional privacy right to refuse medical treatment. Respondent insists that the instant case is distinguishable because here we are considering a blood *test*, rather than the right to refuse *treatment*. However, the test in the instant case is clearly for the proper *treatment* of respondent.

■ As to whether a blood test constitutes an unreasonable search and seizure, we point out that the cases cited by respondent on this issue are clearly distinguishable from the case at bar. The cases cited by respondent do not involve persons who are involuntarily committed at a mental health facility. Moreover, it is generally accepted that blood tests, while invasive, involve virtually no risk, trauma, or pain. (*Schmerber v. California* (1966), 384 U.S. 757, 771, 16 L. Ed. 2d 908, 920, 86 S. Ct. 1826, 1836.) Since our supreme court has previously determined that the administration of psychotropic drugs, when done within the confines of section 2—107.1 of the Code, does not violate a patient's constitutional rights, we extend that holding to necessary blood tests done in conjunction with the administration of psychotropic medication under section 2—107.1 of the Code. See *C.E.*, 161 Ill. 2d 200, 641 N.E.2d 345.

The sixth argument raised by respondent is that he was not accorded due process of law because he was not given advance notice that the State was seeking to involuntarily withdraw his blood. We believe that respondent received adequate notice of the nature of the proceedings.

■ Due process requires notice which is reasonably calculated, under all circumstances, to apprise the interested parties of the pendency of the action and afford them the opportunity to present their objections. (*People v. Sansone* (1974), 18 Ill. App. 3d 315, 324, 309 N.E.2d 733, 740.) In the instant case, a petition for the administration of psychotropic medication was filed, and listed in the reasons for the filing was respondent's "refusal to have medication monitor-

ing by needed drug testing." Respondent never objected to the sufficiency of notice at any time prior to or during the hearing. Most importantly, at the hearing, counsel for respondent agreed that the issue to be decided was whether blood testing was necessary. Respondent was well aware that the issue to be decided was whether respondent would be ordered to undergo blood testing in conjunction with the administration of psychotropic medication. We find that respondent was adequately apprised of the pendency of the action and that the record fails to disclose any due process violations.

The seventh argument raised by respondent is that the State failed to prove by clear and convincing evidence all the requisite elements for the entry of an order pursuant to section 2—107.1 of the Code. Respondent specifically challenges the trial court's findings concerning whether the benefits would outweigh the harm, that respondent lacked capacity to make a reasoned decision about the medication, and that less restrictive services were explored and found inappropriate.

Section 2—107.1 of the Code requires that a trial court must find by clear and convincing evidence that the six conditions, previously set forth, all exist before entering an order allowing a treating doctor to administer psychotropic medication against the patient's will. (405 ILCS 5/2—107.1(d) (West 1994).) On review, we must give great deference to the trial court's factual findings because the trial court stands in the best position to weigh the credibility of the witnesses, and we can only reverse a trial court's determination if we find it to be manifestly erroneous. *In re Long* (1990), 203 Ill. App. 3d 357, 362-63, 561 N.E.2d 290, 294.

■ In the instant matter, Dr. Eisaman testified that respondent suffers from chronic schizophrenia, and that because of this illness respondent's ability to function is deteriorating. The record shows that respondent was previously hospitalized at Choate from September 1991 through September 1993, and after only a two-week respite from the facility, respondent was back suffering from the same mental illness. Dr. Eisaman specifically testified that the benefits of the psychotropic medication outweighed its harm, and that the benefits of the blood tests certainly outweigh the harm. The record, as well as Dr. Eisaman's testimony, shows that respondent lacks the capacity to make a reasoned decision about the medication. Sometimes respondent takes his medication; other times he does not. Sometimes respondent submits to a blood test; other times he does not. Dr. Eisaman also testified that other, less restrictive environments and services had been explored and found inappropriate. In Dr. Eisaman's opinion, the blood testing was necessary to ensure a

safe dosage to respondent. We feel compelled to note that we do share respondent's concern that Dr. Eisaman testified that respondent was receiving 40 milligrams per day of Navane, while the medical records indicate that respondent was receiving 60 milligrams per day. However, on the whole, we cannot say that the trial court's determination was manifestly erroneous.

■ Lastly, respondent maintains that the trial court lacked jurisdiction to enter an order pursuant to section 2—107.1 of the Code because respondent had not refused to receive psychotropic medication. However, the trial court found, and we agree, that refusal to have blood work done constitutes refusal to take the medication. Therefore, we believe that a justiciable matter was presented.

For the foregoing reasons, the order of the circuit court of Union County is affirmed.

Affirmed.

WELCH and HOPKINS, JJ., concur.