# Illinois Official Reports

## Appellate Court

---

### *In re Clinton S.*, 2016 IL App (2d) 151138

---

| | |
|---|---|
| Appellate Court Caption | *In re* CLINTON S., Alleged to be a Person Subject to Involuntary Administration of Psychotropic Medication (The People of the State of Illinois, Petitioner-Appellee, v. Clinton S., Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-15-1138 |
| Filed<br>Rehearing denied | December 2, 2016<br>March 21, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 15-MH-88; the Hon. Divya Sarang, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Veronique Baker, of Guardianship and Advocacy Commission, of Chicago, and Cynthia Z. Tracy, of Guardianship and Advocacy Commission, of Peoria, for appellant.<br><br>Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, Lawrence M. Bauer, and Diane L. Campbell, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.<br>Justices Birkett and Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1    Respondent, Clinton S., had a long history of mental health issues. He had also been diagnosed with end-stage kidney failure. In granting a petition for the involuntary administration of psychotropic medication pursuant to section 2-107.1 of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/2-107.1 (West 2014)), the trial court also ordered that respondent undergo regular hemodialysis treatments. This was based on evidence that hemodialysis was essential for the safe and effective administration of the medication, as respondent's kidneys could not otherwise filter the chemicals from his blood. Respondent appeals, arguing that (1) the State failed to prove by clear and convincing evidence that the benefits of the medication outweighed the harm, and (2) the trial court's order exceeded the scope of the testing and other procedures that are authorized under section 2-107.1. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Respondent was admitted to the Elgin Mental Health Center (EMHC) on February 5, 2015, after being found unfit to stand trial on a robbery charge. He had been hospitalized for issues related to his mental health over 40 times since 1980. At the time of these proceedings, respondent was 53 years old.

¶ 4    On July 23, 2015, the State filed a petition for the involuntary administration of psychotropic medication pursuant to section 2-107.1 of the Mental Health Code. Dr. Mirella Susnjar signed the petition as respondent's treating psychiatrist. In addition to seeking the involuntary administration of several medications, Susnjar requested that respondent be ordered to undergo regular hemodialysis treatments, which she deemed essential for the safe and effective administration of the requested medications. Susnjar noted that respondent was suffering from end-stage kidney failure, and she asserted that hemodialysis was necessary to prolong his life.[1]

¶ 5    The trial court conducted a hearing on the petition on August 21, 2015. Susnjar was the only witness to testify. The parties stipulated that Susnjar was an expert in the field of psychiatry. Susnjar testified that she had performed a psychiatric evaluation on respondent and had diagnosed him with schizophrenia. Susnjar explained that respondent suffered hallucinations and delusions, heard voices, talked to himself, and struggled to converse with other people. Respondent also occasionally became angry and violent. In one instance, he threw a food tray and threatened to kill a nurse. Susnjar testified that respondent's symptoms had not improved from less restrictive treatments such as "one-to-one" and group therapies. She did not believe that respondent was likely to stabilize without psychotropic medication. She had checked respondent's medical records and consulted with his assigned social worker, but she was unable to determine whether respondent had executed a power of attorney for health care or a declaration under the Mental Health Treatment Preference Declaration Act (755 ILCS 43/1 *et seq.* (West 2014)).

---

[1]The Mayo Clinic website describes "hemodialysis" as a procedure used for the treatment of advanced kidney failure in which a machine is used to filter wastes, salts, and fluid from the blood. *Hemodialysis*, Mayo Clinic, http://www.mayoclinic.org/tests-procedures/hemodialysis/home/ovc-20229742 (last visited Nov. 3, 2016).

¶ 6        Susnjar testified that respondent had previously agreed to take Stelazine (trifluoperazine), Haldol (haloperidol), Benadryl (diphenhydramine), and lorazepam. When he took these medications, his symptoms improved. He was able to plan and discuss his legal and health situations. However, he eventually stopped taking the medications due to his preference for "white" Stelazine. Susnjar explained that the EMHC offered only "purple" Stelazine. Beyond the color, the medications were the same. After respondent stopped taking his medications, his symptoms returned.

¶ 7        To treat respondent's mood and psychosis, Susnjar sought to administer specified doses of trifluoperazine, risperidone, quetiapine, and aripiprazole. Susnjar testified that the side effects of the medications included neuroleptic malignant syndrome, involuntary movements, lower blood pressure, sedation, muscle rigidity, tardive dyskinesia, diabetes, weight gain, and cataracts. The primary benefits of the medications were that respondent would become calm and better able to express himself and make decisions.

¶ 8        Susnjar also petitioned for the administration of five alternative medications: haloperidol, fluphenazine, lorazepam, diphenhydramine, and benztropine. She testified that haloperidol and fluphenazine were alternative psychotropic medications for the treatment of psychosis and delirium and that they involved similar side effects and benefits as the primary psychotropic medications. Lorazepam would be used if necessary to treat anxiety; the potential side effects were sedation and addiction. Finally, diphenhydramine and benztropine were used to treat the side effects from the psychotropic medications. The risks included weight gain, confusion, dry mouth, constipation, and difficulty urinating.

¶ 9        Susnjar also testified at length about respondent's kidney disease and her request for hemodialysis treatments. She explained that respondent was admitted to Sherman Hospital for renal failure in April 2015. When respondent was discharged in May 2015, his treating nephrologist diagnosed him with end-stage kidney failure and recommended that he undergo hemodialysis treatments three times per week. Respondent initially received 18 hemodialysis treatments without incident, but he later began refusing the treatments. These refusals happened around the same time that respondent began refusing to take the psychotropic medications. Susnjar testified that she had repeatedly discussed with respondent the status of his kidneys and the need for hemodialysis, but respondent insisted that it was not necessary. Based on these facts, Susnjar opined that respondent's mental illness was directly related to his refusal to undergo hemodialysis. Although Susnjar refrained from speculating on a specific time frame, she opined that respondent would eventually die if he did not receive hemodialysis. Susnjar further opined that the hemodialysis was necessary for the safe and effective administration of the psychotropic medications, because respondent's kidneys could not adequately filter the chemicals from his blood. Susnjar cautioned that, without hemodialysis, the medications could cause a toxic accumulation that could lead to a coma.

¶ 10        On cross-examination, respondent's trial counsel asked Susnjar whether she could safely and effectively administer the psychotropic medications if respondent was not receiving hemodialysis. Susnjar answered that she might be compelled to administer the medications in certain limited circumstances, such as if respondent became violent, but that she would not otherwise administer the medications unless she knew that respondent would be undergoing regular hemodialysis.

¶ 11        In rendering its decision, the trial court acknowledged the potential risks involved with the psychotropic medications, but it found that those risks were outweighed by the benefit of

helping respondent manage his psychosis. The trial court noted Susnjar's testimony that she could not safely and effectively administer the psychotropic medications without the hemodialysis. It accordingly granted the petition, authorizing the administration of each of the requested medications, as well as the hemodialysis, for up to 90 days.

¶ 12      On September 17, 2015, respondent's trial counsel filed a motion to reconsider. The trial court entered an order denying the motion on October 16, 2015. Respondent timely appeals.

¶ 13      II. ANALYSIS

¶ 14      This appeal centers on whether the Mental Health Code was an appropriate vehicle for the State to obtain an order requiring respondent to undergo hemodialysis. Respondent raises two arguments in support of his contention that the trial court erred by granting the State's petition. He first argues that the benefits of the psychotropic medication did not clearly and convincingly outweigh the risk of significant damage to his kidneys and that in finding to the contrary, the trial court improperly factored in his receiving hemodialysis treatments. Respondent's second argument is that the trial court was not authorized under section 2-107.1 of the Mental Health Code to order hemodialysis as an essential procedure for the safe and effective administration of the psychotropic medication. Before addressing these arguments, we must first discuss the issue of mootness.

¶ 15      Respondent acknowledges that, because more than 90 days have passed since the trial court granted the petition, the trial court's order is no longer effective and this appeal is therefore moot. He argues, however, that exceptions to the mootness doctrine apply.

¶ 16      An appeal is considered moot where it presents no actual controversy or where it is impossible for the reviewing court to grant effectual relief to the complaining party. *In re Jonathan P.*, 399 Ill. App. 3d 396, 400 (2010). Reviewing courts generally refrain from considering moot questions. *Id.* However, there are three recognized exceptions to the mootness doctrine: (1) the public-interest exception, which applies where the case presents a question of public importance that will likely recur and the answer will guide public officers in the performance of their duties; (2) the capable-of-repetition exception, which applies to cases involving events of short duration that are capable of repetition, yet evading review; and (3) the collateral-consequences exception, which applies where the answer could have consequences for a party in some future proceedings. *In re Donald L.*, 2014 IL App (2d) 130044, ¶ 19. Although there is no *per se* exception to the mootness doctrine, most appeals in mental health cases fall within one of these established exceptions. *Id.*

¶ 17      Here, respondent argues that the capable-of-repetition and public-interest exceptions apply. The State disagrees, arguing that this appeal presents a straightforward question of the sufficiency of the evidence rather than a question of statutory interpretation or statutory compliance. We agree with respondent. First, given respondent's mental health history and end-stage kidney failure, it is likely that he will be subjected to a petition with similar requests in the future. See *In re Alfred H.H.*, 233 Ill. 2d 345, 360 (2009) (holding that the capable-of-repetition exception applies where there is a substantial likelihood that resolution of an issue will have some bearing on a similar issue involving the same respondent in a subsequent case). Second, cases involving the tests and procedures authorized under the Mental Health Code have not specifically addressed whether a procedure for the treatment of a physical health condition (such as kidney failure) can be ordered pursuant to section

- 4 -

2-107.1. We therefore hold that the capable-of-repetition and public-interest exceptions to the mootness doctrine apply in this case.

¶ 18 Turning to the merits, section 2-107.1 of the Mental Health Code "embodies this State's significant *parens patriae* interest in providing for persons who, while suffering from a serious mental illness or development disability, lack the capacity to make reasoned decisions concerning their need for medication." *In re C.E.*, 161 Ill. 2d 200, 217 (1994). However, the forced administration of psychotropic medication involves a severe interference with a person's liberty. *In re Robert S.*, 213 Ill. 2d 30, 46 (2004). The Mental Health Code therefore provides safeguards to protect mental health patients from the misuse of psychotropic medication by medical staff for purposes other than treating mental illness. *In re Larry B.*, 394 Ill. App. 3d 470, 474 (2009). Pursuant to section 2-107.1(a-5)(4), the forced administration of psychotropic medication is authorized only if the trial court finds clear and convincing evidence regarding each of the following elements:

"(A) That the recipient has a serious mental illness or developmental disability.

(B) That because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms of the mental illness or disability for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior.

(C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.

(D) That the benefits of the treatment outweigh the harm.

(E) That the recipient lacks the capacity to make a reasoned decision about the treatment.

(F) That other less restrictive services have been explored and found inappropriate.

(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment." 405 ILCS 5/2-107.1(a-5)(4) (West 2014).

¶ 19 We note at the outset that respondent challenges the trial court's findings pertaining only to subsections (D) and (G). He has not challenged any of the findings regarding his mental fitness, nor has he challenged his diagnosis of end-stage kidney failure. Respondent also concedes that a patient with end-stage kidney failure will die without artificial support and treatment such as hemodialysis. He nonetheless maintains that the trial court's order improperly infringed on his substantial liberty interest to refuse psychotropic medication and hemodialysis. See *C.E.*, 161 Ill. 2d at 216.

¶ 20 We must also address the parties' disagreement over the applicable standard of review. As noted, the State asserts that this is a "routine sufficiency of the evidence question." This is supported to a certain extent by respondent's brief, in which he labels his arguments as challenges to whether the State satisfied by clear and convincing evidence the statutory factors in question. The State accordingly argues that we should not reverse the trial court's order unless it is against the manifest weight of the evidence. See *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28 ("This court will not reverse a trial court's order permitting the

involuntary administration of psychotropic medication unless it is against the manifest weight of the evidence."). In his reply brief, respondent acknowledges the manner in which he has framed his arguments, but he argues that this case concerns an issue of statutory compliance and that we should therefore review the trial court's order *de novo*. See *Jonathan P.*, 399 Ill. App. 3d at 401 ("Whether the order complied with the [Mental Health] Code presents a question of law, which we review *de novo*.").

¶ 21    As we have discussed, the primary issue respondent raises is whether the Mental Health Code was an appropriate vehicle for the State to ensure that he would undergo hemodialysis. Respondent argues that the trial court improperly factored in the hemodialysis in weighing the benefits and harm of the psychotropic medication and that the trial court lacked authorization to order the hemodialysis. The facts surrounding these issues are not in dispute; they are questions purely of law, and the appropriate standard of review is *de novo*. See *In re Alaka W.*, 379 Ill. App. 3d 251, 259 (2008). Once these issues have been resolved, we will consider whether the trial court's order is against the manifest weight of the evidence.

¶ 22    Respondent first argues that the State failed to prove by clear and convincing evidence that the benefits of the psychotropic medication outweighed the harm. See 405 ILCS 5/2-107.1(a-5)(4)(D) (West 2014). His overarching argument is that, *absent the hemodialysis*, the benefits of the medication did not outweigh the risk of significant damage to his kidneys. This is based on Susnjar's admission that she could not safely administer the medication without knowing that respondent would receive regular hemodialysis, due to the toxic accumulation of chemicals that could otherwise occur in his blood. Respondent concedes in his reply brief that the trial court was properly informed of the benefits and harm, but he asserts that its decision was "based on a contingency that exceeded the Mental Health Code [s]ection 2-107.1 authority." We disagree.

¶ 23    We do not believe that the trial court erred by factoring the hemodialysis into its consideration of whether the benefits of the psychotropic medication outweighed the harm. It is foreseeable that a mental health patient in need of psychotropic medication would be suffering from a physical health condition. It is also foreseeable that the negative effects from a respondent's physical health condition would be exacerbated by psychotropic medication. See *Robert S.*, 213 Ill. 2d at 50 ("Suffice it to say that the involuntary administration of psychotropic drugs may have a profound and sometimes irreversible effect upon a recipient's personality and physical health."). We do not believe that a trial court under these circumstances is bound to consider the benefits and harm of psychotropic medication in a vacuum, without any regard for the absence or presence of treatment for a respondent's physical health condition. Rather, we believe that the better approach is for a trial court to consider the totality of the evidence in rendering its conclusion. Here, the trial court heard evidence that hemodialysis would offset a significant harm that the psychotropic medication would cause. In our view, it would be untenable to hold that this type of evidence may not be factored into a trial court's consideration of the benefits and harm of psychotropic medication.

¶ 24    We find guidance on this issue from *In re Val Q.*, 396 Ill. App. 3d 155 (2009). The respondent in that case had an abnormal QT interval, meaning her heart took an abnormal amount of time to reset itself between beats. The testifying physician acknowledged that the requested medication had the potential to exacerbate the abnormal QT interval, which could increase the risk of arrhythmia or heart attack. The physician stated that he would begin

involuntary treatment only after consulting with the respondent's primary-care physician. The trial court authorized the involuntary treatment with the " 'initial caveat' " that the physician first seek consultation to determine the risks posed by the treatment. *Id.* at 158-59. This court reversed the trial court, holding that information regarding the potential risks to the respondent's heart was necessary before the trial court could engage in any meaningful review of the risks and benefits of the proposed treatment plan. *Id.* at 163.

¶ 25 Unlike the physician in *Val Q.*, Susnjar performed the consultation necessary to inform the trial court of the risks and benefits associated with her proposed treatment plan. Susnjar testified that she had consulted with respondent's nephrologist to find the proper balance of psychotropic medications to maximize the likelihood of respondent's receiving the hemodialysis. She explained that respondent had been voluntarily receiving the hemodialysis when he was taking psychotropic medication; he began refusing the hemodialysis only after he began refusing to take the medication. The "initial caveat" discussed by Susnjar was that, as per her consultation with the nephrologist, so long as respondent was receiving the treatment for his kidneys, the benefits of the medication would outweigh the risks. Susnjar further testified that the involuntary administration of psychotropic medication would serve the dual purposes of improving respondent's mental health and increasing the likelihood of his receiving treatment for his debilitating physical condition. Under these circumstances, we find no fault with the trial court's consideration of whether respondent would be receiving hemodialysis or its conclusion that, with the hemodialysis, the benefits of the requested medications outweighed the harm.

¶ 26 As a corollary to his overarching argument, respondent asserts that Susnjar failed to adequately define an administration plan for the requested medications and that she therefore failed to meaningfully weigh the benefits and harm of her proposed treatment plan. See *In re Williams*, 305 Ill. App. 3d 506, 512 (1999) ("An order allowing the use of psychotropic drugs cannot be based upon a new regimen so poorly defined that the expert could not have meaningfully weighed the benefits and harm involved."). We disagree. The petition and Susnjar's testimony provided enough details to show that she had meaningfully weighed the benefits and harm involved with the requested medications. Moreover, the trial court commented that it "[did] not take lightly the potential serious side effects associated with the medication" but stressed Susnjar's testimony that the medication would help respondent manage his delusions, hallucinations, suffering, and threatening behavior. In light of our holding that the trial court properly considered respondent's receiving hemodialysis, we do not believe that its finding that the benefits of the psychotropic medication outweighed the harm is against the manifest weight of the evidence.

¶ 27 Respondent's second argument is that the trial court was not authorized to order hemodialysis as a procedure for the safe and effective administration of the psychotropic medication. See 405 ILCS 5/2-107.1(a-5)(4)(G) (West 2014) (authorizing the trial court to grant a petition for "testing and other procedures" that are "essential for the safe and effective administration of the treatment"). Respondent acknowledges that section 2-107.1 provides the authority to order blood testing to ensure the safe administration of psychotropic medication where the statute's requirements are met by clear and convincing evidence. *In re Floyd*, 274 Ill. App. 3d 855, 863 (1995); see also *In re Jill R.*, 336 Ill. App. 3d 956, 964 (2003) ("Under the doctrine of *parens patriae*, courts have the implied authority to order periodic blood testing to ensure the safe administration of psychotropic drugs, provided the

requirements of section 2-107.1 of the [Mental Health] Code are met by clear and convincing evidence."). Respondent argues, however, that the statute does not allow for "invasive" procedures such as hemodialysis.

¶ 28    In *Floyd*, the appellate court held that section 2-107.1 would be rendered meaningless if a trial court was unable to order monitoring of medication levels in a respondent's blood. *Floyd*, 274 Ill. App. 3d at 863. The court commented that a doctor who prescribed psychotropic medication could be found guilty of malpractice if the levels of the drugs were not properly monitored and the respondent suffered toxic side effects. *Id.* This court has since held that specific evidence is needed for trial courts to determine which tests are essential for the safe and effective administration of treatment. *Donald L.*, 2014 IL App (2d) 130044, ¶ 26 (concluding that trial courts may not allow doctors to administer unspecified tests at their own discretion). Here, Susnjar satisfied the requirement from *Donald L.* insofar as it pertains to the "other procedures" authorized under section 2-107.1. She testified that, without the hemodialysis, respondent's end-stage kidney failure would render him susceptible to a toxic accumulation of chemicals from the psychotropic medication. We believe that the same rationale for finding authorization to order blood testing in *Floyd* allows us to find authorization to order hemodialysis in this case.

¶ 29    The evidence here reflected that respondent's mental illness symptoms returned after he refused to take psychotropic medication. He became delusional, angry, and unable to converse. He refused to acknowledge the status of his kidneys and he denied that he needed hemodialysis. Susnjar was therefore faced with the choice of (1) taking no action, (2) petitioning for only the involuntary administration of psychotropic medication, or (3) petitioning for hemodialysis in conjunction with the involuntary administration of psychotropic medication. But respondent acknowledges that a patient diagnosed with end-stage kidney failure will die without artificial support and treatment such as hemodialysis. Moreover, because respondent had been found unfit to stand trial on a robbery charge, his commitment to the mental health system was an indication of his lack of decisional capacity. See *Larry B.*, 394 Ill. App. 3d at 476. We therefore believe that Susnjar would have been derelict in her duties had she stood idly by as respondent's mental and physical health simultaneously deteriorated. Likewise, Susnjar could have been found guilty of malpractice if she had administered the psychotropic medication without an assurance that respondent would undergo hemodialysis. Given respondent's dire physical health, we cannot fault Susnjar for choosing the third option.

¶ 30    Respondent maintains that the trial court improperly intruded into his therapeutic medical decisions for the purpose of administering psychotropic medication. He argues that, although Susnjar was unable to determine whether he had executed a power of attorney for health care or a declaration under the Mental Health Treatment Preference Declaration Act (755 ILCS 43/1 *et seq.* (West 2014)), the Mental Health Code was not the proper vehicle for ensuring that he would undergo hemodialysis. Respondent asserts that the proper course of action would have been to have the trial court declare him incompetent and appoint either a personal guardian under the Probate Act of 1975 (755 ILCS 5/11a-17 (West 2014)), or a surrogate under the Health Care Surrogate Act (755 ILCS 40/20 (West 2014)), who would then have the authority to consent to respondent's receiving the hemodialysis. We disagree. Even if one of these alternative vehicles had been used, and assuming that the individual granted such authority would have consented to hemodialysis on respondent's behalf, Susnjar

would not necessarily have been adequately assured that she could safely and effectively administer psychotropic medication. We see no reason why Susnjar should not have persisted with the section 2-107.1 petition as a means of guaranteeing that respondent would receive hemodialysis.

¶ 31 One final case guides our analysis. In *In re Mary Ann P.*, 202 Ill. 2d 393, 406 (2002), our supreme court rejected an argument that section 2-107.1 impliedly allows for the selective authorization of only certain of the requested medications. The court reasoned that such an interpretation would permit the jury to substitute a treatment different from that recommended by the testifying physician and set forth in the petition. *Id.* Thus, where the recommended treatment consists of multiple medications, with some to be administered alternatively, others in combination, and others as needed to counter side effects, "it is only this treatment, in its entirety, that may be authorized." *Id.* at 405-06.

¶ 32 We believe that, pursuant to *Mary Ann P.*, the trial court in this case was precluded from authorizing anything short of the treatment plan recommended by Susnjar, including the hemodialysis. See *Jonathan P.*, 399 Ill. App. 3d at 404 ("While the rule in *Mary Ann P.* does not create an absolute bar on a court's approval of fewer than all of the medications listed in a petition, it requires that any variance from the petition be made at the behest of the treating physician."). Contrary to respondent's repeated suggestions, his mental and physical health conditions were inextricably linked. Out of necessity, Susnjar's treatment plan addressed both of these conditions.

¶ 33 Before concluding, we feel compelled to address respondent's assertion that, by reversing the trial court's order, we would "discourage inappropriate attempts to treat medical conditions in mental health proceedings." Respondent would have us limit the "testing and other procedures" authorized under section 2-107.1 to those deemed noninvasive. However, the State counters by noting that the Mental Health Code does not contain any language limiting the "testing and other procedures" authorized under section 2-107.1 to noninvasive. The State's point is well taken. While we caution that a section 2-107.1 petition should not be used as an end-around to obtain authority for testing or other procedures to treat a respondent's physical health condition, we believe that the statute includes the necessary safeguards. Namely, based on the plain language of section 2-107.1, the State must prove by clear and convincing evidence that the requested testing or other procedures are "essential for the safe and effective administration of the treatment." 405 ILCS 5/2-107.1(a-5)(4)(G) (West 2014). The trial court here ordered the hemodialysis treatments on the basis of its finding that the State satisfied this burden. We do not believe that this finding is against the manifest weight of the evidence.

¶ 34 III. CONCLUSION

¶ 35 The judgment of the circuit court of Kane County is affirmed.

¶ 36 Affirmed.