*In re* HATSUYE T., Alleged to be a Person Subject to Involuntary Electroconvulsive Therapy (Kei Harada, Petitioner-Appellee, v. Hatsuye T., Respondent-Appellant).

First District (4th Division)   No. 1—97—2969

Opinion filed December 24, 1997.

William E. Coffin and Ellen Holden Clark, both of Guardianship and Advocacy Commission, of Chicago, for appellant.

Edward J. Underhill and Jack N. Bernstein, both of Masuda, Funai, Eifert & Mitchell, Ltd., of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

On July 24, 1997, petitioner Kei Harada filed a petition for appointment of guardian for disabled person and a petition for temporary guardian for disabled person, naming respondent in this matter, Hatsuye T., as the respondent in both petitions. On July 25, 1997, petitioner filed a petition for involuntary administration of electroconvulsive therapy (ECT) pursuant to section 2—110 of the Mental Health and Developmental Disabilities Code (the Mental Health Code) (405 ILCS 5/2—110 (West 1996)), naming Hatsuye T. as respondent. Following a bench trial, the trial court appointed petitioner as Mrs. T.'s temporary guardian and authorized him to consent to as many as 10 treatments of ECT, despite Mrs. T.'s objections. Respondent appeals from the entry of an order authorizing petitioner to consent to the involuntary administration of ECT. For the following reasons, we reverse. The relevant facts are as follows.

Mrs. T. is an 82-year-old Japanese woman who has suffered from a recurrent mental illness called severe psychotic depression with delusional features since 1983. She was first hospitalized and treated for this illness in December 1983. The initial treatment plan for psychotic depression is for the patient to receive a series of medications to attempt to bring about remission. At that time, Dr. Sidney Wright prescribed a standard course of medications for Mrs. T., but it failed to bring about a remission. Dr. Wright then recommended the

next level of treatment, ECT. According to Dr. Wright, Mrs. T. showed marked improvement following the administration of ECT, including a complete remission of the delusional beliefs.

Mrs. T. remained in remission until February 1988, when her delusional beliefs recurred. Mrs. T. was again treated with ECT and went into remission. She remained in remission until December 1994, when her symptoms returned. Mrs. T. was again treated with ECT and remained in remission until July 1995. In July 1995, she again received and benefitted from ECT. According to the testimony of Dr. Wright, Mrs. T.'s clinical symptoms of psychotic depression and her delusional beliefs essentially replicated themselves with each episode of illness. With each episode, Mrs. T. believed that she was guilty of some crime, that the government would come to get her, that her money was not like everybody else's, that she would be arrested and taken away from this country and that she would not be allowed to return to her apartment. On numerous occasions throughout this time, Dr. Wright tried to treat Mrs. T. with medications, but to no avail.

On December 26, 1996, Mrs. T. again suffered a relapse and was voluntarily admitted to Northwestern Memorial Hospital (NMH) for treatment of her psychotic depression. Upon admission Mrs. T. signed and the hospital staff accepted an application for voluntary admission, a "Rights of Recipients" form, a consent for treatment, a consent to release confidential information, an assignment of benefits, and a guarantee of payment. In early January 1997, Dr. Wright again tried medication for Mrs. T.'s mental illness, including Wellbutrin, an antidepressant medication, and Zyprexin, an antipsychotic medication, but was again unsuccessful. He then recommended ECT. Mrs. T. refused.

On June 14, 1995, Mrs. T. had executed a health care power of attorney, naming petitioner as her authorized agent for health care decisions. Despite the broad powers given to petitioner under this document, hospital counsel advised Dr. Wright to obtain a court order before proceeding with ECT treatment. Therefore, in January 1997, petitioner initiated guardianship proceedings to obtain judicially approved consent for the administration of ECT. Laurel Spahn was appointed as Mrs. T.'s attorney and Margo Hablutzel was appointed guardian *ad litem*. On January 31, 1997, Mrs. T. signed a written consent for ECT after she was told by Dr. Wright that her only other option was immediate discharge to a nursing home. Mrs. T.'s husband had died in a nursing home and Mrs. T. feared that she too would die if put in a nursing home. Dr. Wright witnessed the consent, accepted it and was prepared to have the treatments administered.

Surprised to hear of Mrs. T.'s consent, given that she had been so determined to refuse the treatment, Spahn and Hablutzel visited Mrs. T. on the afternoon of January 31, 1997, and explained her rights to her. They also informed Mrs. T. that she had the option of refusing the ECT and returning to her apartment since she was voluntarily committed to NMH. Mrs. T. then revoked her consent to ECT, made a written request for discharge, and executed an amendment to her health care power of attorney. The amendment limited the powers of the agent by excluding the right to consent to ECT and to consent to hospitalization or nursing home placement for Mrs. T. Both attorneys witnessed the amendment and later testified at trial that Mrs. T. was competent to execute the document. Mrs. T. was discharged and sent home to her apartment and the guardianship petition was voluntarily withdrawn.

Mrs. T.'s medical condition worsened in July and on July 10, 1997, Mrs. T. was involuntarily committed to NMH. Dr. Wright again recommended ECT. Mrs. T. refused. The guardianship proceedings were reopened and the petition for involuntary administration of ECT was filed. A bench trial was held from August 5 through August 7, 1997, during which the trial court heard the testimony of petitioner, the named agent under Mrs. T.'s power of attorney; petitioner's wife, the named successor agent under Mrs. T.'s power of attorney; Dr. Wright, Mrs. T.'s treating psychiatrist for 14 years; Spahn; Hablutzel; and Dr. Stephen Fox, an osteopathic physician appointed by the court to examine Mrs. T. On August 7, 1997, the trial judge entered an order appointing petitioner the temporary guardian of Mrs. T. and allowing petitioner to consent to up to 10 ECT treatments over Mrs. T.'s objections. Mrs. T. appeals from the portion of the order authorizing petitioner to consent to the involuntary administration of ECT. We note that this court has stayed the trial court's August 7, 1997, order pending resolution of the merits of this appeal. Mrs. T. is presently involuntarily committed to Warren Barr Pavilion nursing home.

On appeal, respondent contends that the trial court's order for the involuntary administration of ECT is void for lack of subject matter jurisdiction. Respondent further contends that the trial court erred in entering said order because involuntary ECT is not the least restrictive treatment available. Finally, respondent contends that section 2—110 of the Mental Health Code violates the Illinois

constitutional guarantees of privacy, substantive due process, and procedural due process.[1]

Respondent first contends that the trial court's order is void for lack of subject matter jurisdiction because section 2—10 of the Durable Power of Attorney Law (755 ILCS 45/2—10 (West 1996)) and section 11a—17 of the Probate Act of 1975 (755 ILCS 5/11a—17 (West 1996)) both prohibit a guardian from exercising authority over matters covered by a power of attorney. Specifically, respondent contends that Mrs. T. amended her power of attorney in January 1997 and specifically excluded the right to consent to ECT. Therefore, the trial court had no authority to authorize petitioner to consent to up to 10 involuntary ECT treatments for Mrs. T., in direct conflict with her wishes as expressed in the January 1997 amendment.

■ Petitioner initially counters that this argument has been waived by Mrs. T. because it was not raised in the trial court. However, the law is clear that lack of subject matter jurisdiction may be raised at any time, even for the first time on appeal. *City of Marseilles v. Radke*, 287 Ill. App. 3d 757, 679 N.E.2d 125 (1997); *Randall v. Wal-Mart Stores, Inc.*, 284 Ill. App. 3d 970, 673 N.E.2d 452 (1996); *Muller v. Jones*, 243 Ill. App. 3d 711, 613 N.E.2d 271 (1993). Therefore, we reject petitioner's contention that this argument has been waived.

■ In section 4—1 of the Powers of Attorney for Health Care Law (755 ILCS 45/4—1 (West 1996)), the Illinois General Assembly recognized the right of an individual to control all aspects of his or her personal care and medical treatment. 755 ILCS 45/4—1 (West 1996). Included in this right is the right to appoint an agent to make personal and health care decisions for an individual throughout his or her lifetime, including during periods of disability, that will be honored by third parties at all times. 755 ILCS 45/2—1 (West 1996). Specifically, pursuant to section 4—3 of the Powers of Attorney for Health Care Law, an individual may delegate to her agent "all powers an individual may have to be informed about and to consent to or refuse or withdraw any type of health care for the individual." 755 ILCS 45/4—3 (West 1996).

In general, "[a]bsent court order directing a guardian to exercise powers of the principal under the agency, a guardian will have no power, duty or liability with respect to *** any personal or health care matters covered by the agency." 755 ILCS 45/2—10 (West 1996). Once a valid power of attorney has been executed, a guardian cannot

[1]Respondent's constitutional arguments are moot following the enactment of Public Act 90—538, which amended section 2—110 of the Mental Health Code. Consequently, these contentions need not be addressed.

exercise authority over matters that are covered by the power of attorney. 755 ILCS 5/11a—17(c) (West 1996) (absent court order pursuant to the Illinois Power of Attorney Act, a guardian has no power, duty or liability with respect to any health care matters covered by the agency); *In re Guardianship of Mabry*, 281 Ill. App. 3d 76, 666 N.E.2d 16 (1996). This is true even if the principal has become incompetent, because a power of attorney is binding even during periods of disability. 755 ILCS 45/2—1 (West 1996).

There is one exception to this general rule. Section 2—10 of the Durable Power of Attorney Law provides that under certain circumstances the court may order a guardian to take necessary actions to protect the best interests of the principal even though the matters are covered by a power of attorney. Specifically, section 2—10 of the Durable Power of Attorney Law provides:

> "Upon petition by any interested person (including the agent), with such notice to interested persons as the court directs and a finding by the court that the principal lacks the capacity to control or revoke the agency: (a) if the court finds that the agent is not acting for the benefit of the principal in accordance with the terms of the agency or that the agent's action or inaction has caused or threatens substantial harm to the principal's person or property in a manner not authorized or intended by the principal, the court may order a guardian of the principal's person or estate to exercise any powers of the principal under the agency, including the power to revoke the agency, or may enter such other orders without appointment of a guardian as the court deems necessary to provide for the best interests of the principal ***." 755 ILCS 45/2—10 (West 1996).

Absent a finding by the court that (1) the principal lacks the capacity to control or revoke the agency and (2) the agent is not acting in accord with the terms of the agency or the agent's action or inaction has caused or threatens substantial harm to the principal, a guardian cannot exercise authority over a matter covered by a power of attorney. 755 ILCS 45/2—10 (West 1996).

In the present case, Mrs. T. executed a valid health care power of attorney in June of 1995, naming petitioner as her agent. She amended that power of attorney on January 31, 1997, and specifically excluded the power to consent to ECT and the power to consent to hospitalization or placement in a nursing home. The evidence is uncontradicted that the January 31, 1997, amendment to the power of attorney was valid. Attorneys Spahn and Hablutzel testified that they witnessed Mrs. T.'s signature on the amended power of attorney and that they each felt that Mrs. T. had the capacity to sign the document. Dr. Fox, the physician appointed by the court to examine

Mrs. T., testified that he believed Mrs. T. had the capacity to make decisions regarding medical treatment on January 31, 1997.

Furthermore, the staff at NMH treated Mrs. T. as if she had capacity to make medical decisions at that time. On December 26, 1996, the NMH staff accepted Mrs. T.'s application for voluntary admission. On that same day, Mrs. T. signed and the NMH staff accepted a "Rights of Recipients" form, a consent for treatment, a consent to release of confidential information, an assignment of benefits, and a guarantee of payment.

Perhaps most significant to the question of capacity is the fact that on the morning of January 31, 1997, Dr. Wright witnessed Mrs. T.'s signature on a written consent to ECT. Dr. Wright admitted that he would have administered the treatment based on that written consent. He also testified that Mrs. T.'s condition had not changed from the morning of January 31, 1997, to the afternoon when she revoked her consent and amended her power of attorney. This evidence is uncontradicted. There can be no question that the January 31, 1997, amendment is valid. Therefore, pursuant to section 2—10 of the Durable Power of Attorney Law, the trial court had no authority to authorize the petitioner to consent to ECT treatments for Mrs. T. in direct conflict with her amended power of attorney.

We reject petitioner's contention that the exception set forth in section 2—10 of the Durable Power of Attorney Law applies in this case. The statute is clear that before the exception applies and the court can order a guardian to act, the court must find (1) that the principal lacks the capacity to control or revoke the agency and (2) that the agent is not acting in accordance with the terms of the agency or that the agent's action or inaction has caused or threatens substantial harm to the principal "in a manner not authorized or intended by the principal." Absent such a finding, the court has no authority to order a guardian to act.

No such finding was made in this case. There was no finding by the trial court that Mrs. T. lacked capacity to control or revoke the agency. The trial judge found only that Mrs. T. presently lacked the specific capacity to make informed decisions about ECT. Furthermore, there was absolutely no evidence that petitioner ever attempted to consent to ECT in violation of the power of attorney or that Mrs. T. could not control him if he did. We reject petitioner's contention that his inability to consent to ECT threatens substantial harm to Mrs. T. "in a manner not authorized or intended by the principal." The inability to consent to ECT is not a manner not authorized or intended by the principal. In fact petitioner's inability to consent to ECT is exactly what Mrs. T. intended.

Neither of the required showings has been made. Therefore, we find that pursuant to section 2—10 of the Durable Power of Attorney Law and section 11a—17 of the Probate Act of 1975, the trial court lacked subject matter jurisdiction to enter this order. The law is clear that an order entered by a court that lacks subject matter jurisdiction is void. *In re M.M.*, 156 Ill. 2d 53, 619 N.E.2d 702 (1993); *In re Rami M.*, 285 Ill. App. 3d 267, 673 N.E.2d 358 (1996). Therefore, we find that the trial court's order is void for lack of subject matter jurisdiction.

Petitioner points out that although the amended power of attorney also revoked the power to consent to hospitalization or placement in a nursing home, Mrs. T. made no objection to her involuntary commitment to NMH on July 10, 1997, or her involuntary commitment to Warren Barr Pavilion nursing home on August 27, 1997. This is irrelevant. Mrs. T.'s failure to object to these commitments does not change the fact that the trial court lacked subject matter jurisdiction under section 2—10 of the Durable Power of Attorney Law to order ECT and that the trial court's order is void.

Respondent next contends that the trial court erred in entering its order because involuntary ECT is not the least restrictive treatment available. Specifically, respondent contends that she has a constitutional right to refuse ECT and that her right can be lawfully infringed only by the least restrictive means available.

■ An individual has a significant due process liberty interest in refusing the administration of unwanted, nonemergency psychotropic medications. *In re C.E.*, 161 Ill. 2d 200, 641 N.E.2d 345 (1994); *In re Barbara H.*, 288 Ill. App. 3d 360, 680 N.E.2d 471 (1997). There is at least as significant a liberty interest in refusing unwanted ECT. *In re Branning*, 285 Ill. App. 3d 405, 674 N.E.3d 463 (1996), *cert. granted*, 172 Ill. 2d 552 (1997). This is also evidenced by the Illinois legislature's recent amendment to the Mental Health and Developmental Disabilities Code. Pursuant to Public Act 90—538, ECT was included in section 2—107.1 of the Mental Health Code, the psychotropic medication statute, so that an individual faced with involuntary administration of ECT would receive the same due process protections as an individual faced with involuntary administration of psychotropic medications. This liberty interest cannot be infringed absent a showing that other less restrictive services have been considered and found ineffective. *In re C.E.*, 161 Ill. 2d 200, 641 N.E.2d 345 (1994); *In re Estate of Austwick*, 275 Ill. App. 3d 769, 656 N.E.2d 779 (1995) (reversed order allowing involuntary administration of ECT where less restrictive treatment with medications not tried).

■ As a reviewing court, we give great deference to the trial

court's factual findings because the trial court stands in the best position to weigh the credibility of all the witnesses. *In re Jones*, 285 Ill. App. 3d 8, 673 N.E.2d 703 (1996). Therefore, we will reverse the trial court's determination only if we find it to be manifestly erroneous. *Jones*, 285 Ill. App. 3d 8, 673 N.E.2d 703; *In re Floyd*, 274 Ill. App. 3d 855, 655 N.E.2d 10 (1995); *In re Schaap*, 274 Ill. App. 3d 497, 654 N.E.2d 1084 (1995). In the present case, we do not find the trial court's determination that less restrictive treatments were explored and found wanting to be manifestly erroneous.

Respondent contends that during her January 1997 hospitalization, Dr. Wright prescribed Wellbutrin, a new antidepressant medication. After 10 days Dr. Wright discontinued the medication in anticipation of administering ECT. Respondent argues that she was not given a sufficient trial period of Wellbutrin, a less restrictive form of treatment than ECT.

The record reveals that when asked if 10 days were a sufficient trial period, Dr. Wright testified that ideally he would have continued the Wellbutrin another 10 days or so, but that there was no question that ECT was the treatment of choice for this particular patient. Indeed, the evidence indicates that Mrs. T. has a 14-year history with Dr. Wright, during which time she was prescribed various antidepressant drugs on numerous occasions. The drugs always failed to bring about remission. Dr. Wright testified that based on the fact that medications had failed to prove helpful to Mrs. T. in the past, he did not regard them as a useful less restrictive option for her.

Respondent's reliance on *In re Estate of Austwick*, 275 Ill. App. 3d 769, 656 N.E.2d 779 (1995), is misplaced. In *Austwick*, the court held that ECT was not in Mrs. Austwick's best interest because other less restrictive alternatives had not been considered or tried. The doctor in that case testified that there were a number of medications he could prescribe to help Mrs. Austwick, yet he prescribed none, and none were tried. There was no history of taking medications. Here, unlike in *Austwick*, Mrs. T. has a 14-year history of trying various medications to no avail.

Given this evidence, the trial court's determination that less restrictive treatments had been explored and found wanting was not manifestly erroneous. However, in light of our finding that the trial court lacked subject matter jurisdiction under section 2—10 of the Durable Power of Attorney Law, the trial court's order is void.

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is reversed.

Judgment reversed.

CERDA, P.J., and WOLFSON, J., concur.