2022 IL App (3d) 160710

Opinion filed January 18, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* MARCUS S., a Person Found Subject to Involuntary Commitment and Involuntary Medication | ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois.<br><br><br>Appeal No. 3-16-0710<br>Circuit No. 16-MH-245 |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | The Honorable<br>Suzanne Patton<br>Judge, Presiding. |
| v. | ) ) | |
| Marcus S., | ) ) | |
| Respondent-Appellant). | ) | |

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justice Lytton concurred in the judgment and opinion.
Justice Schmidt dissented, with opinion.

**OPINION**

¶ 1 The trial court ordered the respondent-appellant, Marcus S., subject to involuntary commitment at an inpatient mental health treatment facility and subject to involuntary treatment through the administration of psychotropic medications. Marcus appeals those judgments, arguing that the State failed to present evidence as to certain essential elements of the

involuntary commitment and involuntary medication statutes in the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1-100 *et seq*. (West 2016)) and otherwise failed to satisfy various mandatory requirements of those statutes.

¶ 2                                                    FACTS

¶ 3        At the time of the events at issue, Marcus S. was 23 years old. He lived in Canton, Illinois, in a house his parents bought for him. He has a history of mental illness and has been treated with various psychotropic medications on and off since he was 18 years old. In mid-October, 2016, Marcus burned his hand while attempting to burn large quantities of trash in his backyard, far away from his house. He put out the fire himself and went to the emergency room where he received treatment for his hand.

¶ 4        One week later, Marcus's father brought him to Unity Point Methodist Hospital in Peoria (Unity Point) for follow-up burn care and possible mental health care. Marcus was admitted to the hospital as a psychiatric patient. Although Marcus tried to sign in on a voluntary basis, Unity Point staff filed a petition for involuntary commitment under the Code on October 25, 2016. The petition did not include the names of any of Marcus's relatives or information as to why they could not be contacted, as required by section 3-601(b)(2) of the Code (*id*. § 3-601(b)(2)). The State did not amend the petition to add the names of Marcus's relatives, and Marcus's counsel did not object to this defect.

¶ 5        On October 27, 2016, Marcus's treating psychiatrist at Unity Point, Dr. Andrew Lancia, filed a petition for involuntary medication requesting the administration of 27 medications. Dr. Lancia filed a preprinted form listing the statutory criteria for involuntary treatment under the Code and directing the preparer to identify reasons why the statutory criteria had been met. However, Dr. Lancia did not list any facts supporting any of the statutory criteria. Marcus's

2

counsel never moved to dismiss the petition for failing to state a cause of action or otherwise objected to the petition's inadequacy.

¶ 6 The commitment and medication hearings were both held on November 1, 2016. Marcus testified that he had tried to sign himself into Unity Point as a voluntary patient but was not permitted to do so. Marcus's counsel did not ask for a recess to address Marcus's attempt to become a voluntary admittee.

¶ 7 Dr. Lancia testified that Marcus's father reported increasingly dangerous behavior by Marcus, such as placing microwave popcorn in the oven and running a vacuum cleaner in standing water. The State did not call Marcus's father as a witness. Dr. Lancia also testified that Marcus's home was "a shambles," that Marcus had not been cleaning up after his cats, and that Marcus had a prior history of mental illness, including a prior suicide attempt. Dr. Lancia diagnosed Marcus as having bipolar disorder with schizotypical personality disorder.

¶ 8 Dr. Lancia further testified that Marcus had been taking Zyprexa at the hospital voluntarily as prescribed for the a few days. However, Dr. Lancia feared that Marcus might stop taking the Zyprexa when he left the hospital. He therefore opined that Marcus needed an injection of long-acting medication. Dr. Lancia opined that Risperdal's long-acting injection was a more practical alternative than Zyprexa's long-acting injection because Zyprexa required the patient to sit for a long period of time while the injection is administered and would therefore require a willing patient.

¶ 9 Dr. Lancia did not file a predisposition report containing a social history and a detailed treatment plan including treatment goals and an estimated timetable for their attainment, as required by the Code. Rather, he merely filed a cursory, one-page treatment plan that listed problems and goals but no specific treatment methods or timetable. Marcus's counsel did not

3

object to the incomplete treatment plan or to the absence of a predisposition report. Dr. Lancia testified in conclusory fashion that he did not believe that Marcus could be released to a less restrictive facility than Unity Point.

¶ 10 The trial court ordered Marcus subject to involuntary commitment at Unity Point for 90 days. It found Unity Point to be the least restrictive treatment alternative. The court concluded that, because of his mental illness, Marcus was reasonably expected to engage in conduct placing himself or others in danger of physical harm. It further found that Marcus was unable to understand the need for treatment because, although he had been taking Zyprexa, he had refused Risperdal and was therefore likely to deteriorate if not treated as an inpatient.

¶ 11 The involuntary medication hearing took place immediately after the commitment hearing. During the medication hearing, Dr. Lancia testified that Marcus was voluntarily taking Zyprexa and "seem[ed] to show some improvement." However, Dr. Lancia stated that Risperdal or Haldol would be better options because they allow for a long-lasting injectable form to be given once every two to four weeks. Dr. Lancia asked the court to approve 27 medications in all. Although he testified that, to his knowledge, Marcus had not suffered any side effects from any of the 27 medications at issue, he acknowledged that Marcus had "potential allergies" to two of the requested medications, Risperdal and Haldol.

¶ 12 Marcus testified that, when he had taken Risperdal and Haldol in the past, he could not breathe and was not able to move his jaw, arms, or legs. He described these reactions as "horrible" and very painful. Marcus stated that, for that reason, he refused to take Haldol or Risperdal because the Zyprexa was "working just fine" and he did not have any adverse reactions to Zyprexa. He did not want Haldol or Risperdal forced on him. Marcus's mother testified that, when Marcus was hospitalized at another facility several years ago, the hospital

4

staff told her that he had experienced tremors, involuntary twitches, and jaw locking, which was alleviated by another "side effect" medication. However, Marcus testified that "it didn't help, it still hurt."

¶ 13 Thereafter, Dr. Lancia was recalled to testify. Given Marcus's mother's testimony, Dr. Lancia stated that he would "prefer to stay away" from Risperdal and that Risperdal would be "really down the line" of medications he wished to administer to Marcus. He acknowledged that Marcus might also have "minor problems" with Haldol. Dr. Lancia stated that he was now considering different options than he was before, like "sticking with the atypicals," *i.e.*, second generation drugs with fewer side effects, such as Abilify and Invega, both of which have long-lasting injectables.

¶ 14 Although a 105-page packet of medication handouts was filed in the record, information about one of the 27 requested medications (Abilify Aristrada) was not included in the packet. Moreover, no witness testified that the packet was ever provided to Marcus. Marcus's counsel did not object to the incomplete packet or to the lack of proof that Marcus was provided with the packet.

¶ 15 The trial court found Marcus subject to all 27 of the requested medications for up to 90 days. This appeal followed.

¶ 16 ANALYSIS

¶ 17 1. The State's Failure to Comply With the Involuntary Admission Statute

¶ 18 Marcus argues that the State failed to satisfy certain mandatory requirements of the involuntary admission statutes in the Code. We agree.

¶ 19 Section 3-601(b)(2) of the Code requires the State to include the names and contact information of the admittee's family members in in its petition for involuntary admission, or, if

5

no such names are included, to identify the steps taken to make a diligent inquiry to identify and locate any such family members. 405 ILCS 5/3-601(b)(2) (West 2016). In this case, the State did neither. Failure to provide this information rendered the State's petition fatally defective. *In re Lance H.*, 402 Ill. App. 3d 382, 387-89 (2010).

¶ 20　　　Further, the State failed to file a predisposition report as required by section 3-810 of the Code (405 ILCS 5/3-810 (West 2016)). The predisposition report must include (1) information on the appropriateness and availability of alternative treatment settings; (2) a social investigation of the respondent; and (3) a detailed preliminary treatment plan that addresses the respondent's problems and needs, treatment goals, proposed treatment methods, and a projected timetable for the attainment of the treatment goals. *Id.* The State filed no predisposition report in this case. Instead, it filed a cursory, one-page care plan that did not include all of the required elements of a preliminary treatment plan under section 3-810, much less all of the required elements of a predisposition report under that section. The one-page care plan listed problems and goals but did not contain any proposed treatment methods or a projected timetable for the proposed treatment. Nor did it include a social investigation of Marcus or a written report on alternative treatment settings. There was no testimony presented on these matters proving this information. Dr. Lancia was asked whether he believed that Marcus could be released into any less restrictive facility than Unity Point, and he answered "no." Such conclusory, cursory testimony does not suffice. *In re Daryll C.*, 401 Ill. App. 3d 748 (2010). Dr. Lancia was not asked to opine regarding the other information required by section 3-810, and he offered no such opinion.

¶ 21　　　These procedural and evidentiary failures require reversal of the State's petition for involuntary admission. Because we reverse the trial court's involuntary commitment order, we must also reverse the involuntary medication order, which was contingent upon Marcus

receiving inpatient care pursuant to the commitment order. *In re John N.*, 364 Ill. App. 3d 996, 998-99 (2006). The State concedes this point.

¶ 22    Accordingly, we could resolve the appeal on this ground alone. However, the State's involuntary medication petition was also patently inadequate and riddled with reversible errors, and Marcus's trial counsel did nothing to address many of them. Because these types of flagrant failures, utter disregard of the Code's requirements, and dereliction of duty both by trial courts and counsel for both parties recur with disturbing regularity, we choose to address the involuntary medication order as well.

¶ 23    2. The State's Failure to Comply With the Involuntary Treatment Statute

¶ 24    The trial court erred in ordering the involuntary administration of 27 drugs because the State failed to comply with several mandatory requirements of the Code's involuntary treatment statute (405 ILCS 5/2-107 (West 2016)). Specifically, the State failed to establish that (1) Marcus lacked the capacity to make a reasoned decision about the proposed treatment; (2) other, less restrictive alternatives to involuntary medication had been explored and found inappropriate; and (3) the benefits of each requested medication outweighed its potential harm.

¶ 25    The administration of involuntary mental health services entails a " 'massive curtailment of liberty.' " *In re Barbara H.*, 183 Ill. 2d 482, 496 (1998) (quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)); see also *In re Torry G.*, 2014 IL App (1st) 130709, ¶ 31 ("Autonomous decisionmaking in matters affecting the body and mind is one of the most valued liberties in a civilized society." (Internal quotation marks omitted.)). When the State seeks to forcibly administer psychotropic medication to an individual, the interference with the individual's liberty is " 'particularly severe.' " *In re Robert S.*, 213 Ill. 2d 30, 46 (2004) (quoting *Riggins v. Nevada*, 504 U.S. 127, 134 (1992)). Under the due process clause of the fourteenth amendment to the

7

United States Constitution (U.S. Const., amend. XIV), a mentally ill person has a liberty interest to refuse medical treatment, including the administration of psychotropic medications. *In re C.E.*, 161 Ill. 2d 200, 213 (1994). However, this liberty interest is balanced against the State's legitimate *parens patriae* interest in furthering the treatment of a mentally ill person who lacks the capacity to make a reasoned decision concerning his or her need for such medication.

¶ 26     In 1991, the legislature enacted the involuntary-treatment statute of the Code (Ill. Rev. Stat. 1991, ch. 91½, ¶ 2-107 (now codified at 405 ILCS 5/2-107.1)) as a mechanism for determining when psychotropic medication may be administered over an individual's objections. Section 2-107.1(a-5)(4) provides that psychotropic medication shall not be involuntarily administered to a patient unless *all* of the following factors are present:

"(A) That the recipient has a serious mental illness or developmental disability.

(B) That because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms of the mental illness or disability for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior.

(C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.

(D) That the benefits of the treatment outweigh the harm.

(E) That the recipient lacks the capacity to make a reasoned decision about the treatment.

8

(F) That other less restrictive services have been explored and found inappropriate.

(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment." 405 ILCS 5/2-107.1(a-5)(4) (West 2016).

Section 2-107.1 serves as the legal standard for balancing an individual's liberty interests and the State's interest in treating persons with mental illnesses. The Illinois Supreme Court upheld the constitutionality of section 2-107.1, in part, because the statute is "narrowly-tailored" to balance individual liberty against the State's interest and because the statute's "strict standards" "must be satisfied by clear and convincing evidence before medication can be ordered" on an involuntary basis. *C.E.*, 161 Ill. 2d at 218.

¶ 27 Whether there was compliance with a statutory provision presents a question of law, which we review *de novo*. *In re Nicholas L.*, 407 Ill. App. 3d 1061, 1072 (2011). However, a reviewing court will not reverse a trial court's determination as to the sufficiency of the evidence unless it is against the manifest weight of the evidence. *In re Laura H.*, 404 Ill. App. 3d 286, 290 (2010). A judgment is against the manifest weight of the evidence only where the opposite conclusion is apparent or where the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Id.*

¶ 28 Here, the State did not satisfy several of section 2-107.1's mandatory requirements for the involuntary administration of psychotropic medication. First, the State failed to demonstrate that Marcus lacked the capacity to make a reasoned decision about his treatment. The State cannot demonstrate such incapacity without showing, *inter alia*, that Marcus had received *written* notice of the risks and benefits of, *and alternatives to*, each of the proposed medications,

9

as required by section 2-102(a-5) of the Code (405 ILCS 5/2-102(a-5) (West 2016)). " 'If such [written] notice is not given, then the State cannot establish that a respondent lacks the capacity to make a "reasoned decision" about treatment, because the written notice forms the basis upon which such a decision can be made.' " *In re Wilma T.*, 2018 IL App (3d) 170155, ¶ 23 (quoting *In re Katarzyna G.*, 2013 IL App (2d) 120807, ¶¶ 16-17); see also *Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 22; *In re Linda K.*, 407 Ill. App. 3d 1146, 1153 (2011), *overruled on other grounds*, *In re Rita P.*, 2014 IL 115798, ¶¶ 33-34. Although a 105-page packet of medication handouts was filed in the record (the first page of which is signed by someone who claimed to have given the materials to Marcus), no one testified at trial that this packet was provided to Marcus. Moreover, even if Marcus had received the packet, it would not have satisfied the Code's written notice requirement because it contained no information whatsoever about one of the medications requested by the State and no information about possible treatment alternatives to the 27 proposed medications. To comply with section 2-107.1's requirements, the State had to provide evidence of the benefits and harms of *each* of the proposed drugs (*In re Alaka W.*, 379 Ill. App. 3d 251, 263 (2008)) and had to show that the benefits of each drug outweighed its harms (*In re C.S.*, 383 Ill. App. 3d 449, 452-53 (2008)). If only one medication on a proposed medication package does not satisfy this requirement, then the entire medication package must fail. *C.S.*, 383 Ill. App. 3d at 452-53; *In re Mary Ann P.*, 202 Ill. 2d 393, 405-06 (2002). The legislature did not intend the courts to authorize less than what the treating doctor prescribed or to otherwise engage in selective authorization of psychotropic medication. *Mary Ann P.*, 202 Ill. 2d at 405-06.

Accordingly, as a matter of law, the State failed to demonstrate that Marcus lacked the capacity to make a reasoned decision about his own medical treatment.[1]

¶ 29      For this reason alone, the trial court committed reversible error by approving the State's involuntary medication petition. *Wilma T.*, 2018 IL App (3d) 170155, ¶ 23; *Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 22. The Code's written notice requirement demands strict compliance. It may not be waived (*Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 14) or satisfied by anything less than complete written notice of all the information listed in the statute, including alternatives to medication (*Wilma T.*, 2018 IL App (3d) 170155, ¶ 23; *Linda K.*, 407 Ill. App. 3d at 1153-34).

¶ 30      Further, there was evidence that Marcus had the capacity to make a reasoned decision about his treatment. During the trial, Marcus testified cogently and showed an awareness of the side effects of Haldol and Risperdal, and he testified about the particular side effects he had experienced when he took those drugs in the past, which was corroborated by his mother's testimony. Marcus rationally explained his reasons for declining the medications Dr. Lancia had offered. In addition, Marcus was voluntarily taking Zyprexa while under Dr. Lancia's care at the hospital, which suggests that Dr. Lancia was treating him as a person with the capacity to consent to mental health treatments. *In re Hatsuye T.*, 293 Ill. App. 3d 1046, 1052 (1997) (noting that it is "most significant to the question of capacity" when medical professionals treat their mentally ill patient as if she had the capacity to make her own treatment decisions). A person does not lack the capacity to make decisions about his own treatment merely because he has a mental illness (*In re Alaka W.*, 379 Ill. App. 3d at 265; *In re Phyllis P.*, 182 Ill. 2d 400, 401 (1998)) or because he disagrees with his doctor's proposed treatment (*In re Nicholas L.*, 407 Ill.

---

[1] When asked at trial whether he believed that Marcus had the capacity to make a reasoned decision on whether to take the psychotropic medications, Dr. Lancia answered, "No." This one-word, unsupported, conclusory opinion is insufficient as a matter of law to establish a lack of capacity. *In re Larry B.*, 394 Ill. App. 3d 470, 477 (2009).

App. 3d at 1076). Marcus's testimony and the other evidence presented at trial suggested that Marcus had the capacity to make a reasoned decision about his treatment. See *In re Israel*, 278 Ill. App. 3d 24, 37 (1996); *Hatsuye T.*, 293 Ill. App. 3d at 1052. Dr. Lancia's testimony to the contrary was conclusory and insufficient to prove incapacity. *Larry B.*, 394 Ill. App. 3d at 477.

¶ 31        Moreover, the State failed to prove by clear and convincing evidence that the benefits of Dr. Lancia's proposed drug treatments outweighed the harm of those treatments, as required by section 2-107.1(a-5)(4)(D) of the Code (405 ILCS 5/2-107.1(a-5)(4)(D) (West 2016)). Although Dr. Lancia mentioned the benefits or harms of some of the drugs he proposed, he did not do so for all of them. In addition, the State failed to prove that the benefits of two of the drugs, Haldol and Risperdal, outweighed the serious harms that they could cause Marcus, especially given his history of suffering severe side effects while taking those drugs. As noted above, the State was required to provide evidence of the benefits and harms of *each* of the 27 proposed drugs and show that the benefits of each drug outweighed its harms. *Alaka W.*, 379 Ill. App. 3d at 263; *C.S.*, 383 Ill. App. 3d at 452-53.

¶ 32        Because these errors and omissions require reversal of the State's involuntary treatment petition, we need not address the State's alleged failure to satisfy other required elements of the involuntary medication statutes. However, we note, once again, that we find it alarming that these types of fundamental and obvious errors occur. The Code provides that the state's attorney "shall ensure that petitions, reports and orders [filed pursuant to the Code] are properly prepared." 405 ILCS 5/3-101 (West 2016). The state's attorney utterly failed to fulfill this obligation in this case. Accordingly, the involuntary commitment and medication orders must be reversed.

¶ 33                                    3. Ineffective Assistance of Counsel

12

¶ 34　　　　Marcus further argues that his trial counsel provided ineffective assistance during the involuntary admission and involuntary medication proceedings. We agree. Respondents facing involuntary commitment or involuntary admission of psychotropic medication have a statutory right to counsel under the Code. 405 ILCS 5/3-805 (West 2016); *Barbara H.*, 183 Ill. 2d at 493-94. This right to counsel includes the right to effective assistance of counsel; anything less would render the statutory guarantee of counsel a mere "hollow gesture serving only superficially to satisfy due process requirements." (Internal quotation marks omitted.) *In re Tara S.*, 2017 IL App (3d) 160357, ¶ 17. In determining whether counsel has effectively tested the State's case in proceedings under the Code, our appellate court applies the *Strickland* standard. See *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance under this standard, a respondent must show that his counsel's performance was deficient (*i.e.*, that he committed errors so serious that he was not functioning as counsel as contemplated by the Code) and (2) counsel's errors were so prejudicial as to deprive the respondent of a fair hearing. *In re Tara S.*, 2017 IL App (3d) 160357 ¶ 19. Of "paramount importance" in involuntary health proceedings is whether respondent's counsel held the State to its burden of proof and to its procedural requirements. *In re Sharon H.*, 2016 IL App (3d) 140980, ¶ 42.

¶ 35　　　　Marcus contends that his counsel provided ineffective assistance in this case by (1) failing to protect Marcus's right to request voluntary admission, (2) failing to protect Marcus's right to the least restrictive form of treatment with psychotropic medication, and (3) failing to hold the state to various procedural and substantive requirements of the Code. Because Marcus's third argument is dispositive of this issue, we will address that argument only.

¶ 36　　　　In this case, the State failed to comply with several mandatory requirements of the Code without meeting any challenge or objection from Marcus's counsel. As noted above, section 3-

13

601(b)(2) of the Code required the State either to include the names and contact information of Marcus's family members in the involuntary admission petition or, if no such names are provided in the petition, to identify the steps taken to make a diligent inquiry to identify and locate any such family members. 405 ILCS 5/3-601(b)(2) (West 2016). The State did neither. Failure to provide this information rendered the State's petition fatally defective. *Lance H.*, 402 Ill. App. 3d at 387-89. Nevertheless, Marcus neither objected to the deficiencies in the State's petition nor moved to dismiss the petition. This failure was so prejudicial to Marcus that it deprived him of a fair trial. Marcus's counsel's failure to notify the trial court that the State's petition was defective amounted to ineffective assistance. See *In re Jessica H.*, 2014 IL App (4th) 130399, ¶¶ 26, 35.

¶ 37        Moreover, the State's involuntary treatment petition merely incorporated the statutory standards for granting such a petition, *i.e.*, it baldly stated the legal conclusions justifying an order of involuntary medication but did not include any facts supporting those conclusions or explain Dr. Lancia's reasons for finding the statutory criteria satisfied. Illinois is a fact-pleading jurisdiction. *Schloss v. Jumper*, 2014 IL App (4th) 121086, ¶ 20. In order to state a claim for involuntary medication, the State had to allege facts in support of its claim, not merely legal conclusions. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429-30 (2006); *Kucinsky v. Pfister*, 2020 IL App (3d) 170719, ¶ 55. A complaint that alleges mere conclusions fails to state a claim and is insufficient to withstand a motion to dismiss. *Kucinsky*, 2020 IL App (3d) 170719, ¶ 55. Because the State's petition was conclusory and contained no supporting facts, it was facially deficient. *Jessica H.*, 2014 IL App (4th) 130399, ¶¶ 26, 35. Nevertheless, Marcus's counsel did not move to dismiss the petition. This error also constituted ineffective assistance. *Jessica H.*, 2014 IL App (4th) 130399, ¶¶ 26, 35 (counsel's failure to notify the trial court that the State's

14

commitment petition was untimely or to move to dismiss the petition constituted ineffective assistance).

¶ 38    Further, as noted, the State failed to file a predisposition report as required by section 3-810 of the Code (405 ILCS 5/3-810 (West 2016)). Instead, it filed a cursory, one-page care plan that did not include all of the required elements of a preliminary treatment plan under section 3-810, much less all of the required elements of a predisposition report. Nor did the State present any testimony on these matters that could have sufficed in lieu of a predisposition report. The conclusory, cursory testimony presented by the State does not satisfy section 3-810's mandatory requirements. See, *e.g.*, *Daryll C.*, 401 Ill. App. 3d 748. A respondent's counsel provides ineffective assistance when he does not object to the State's failure to file a proper predisposition report, particularly where, as here, the State did not present testimony as to each of the required elements of a predisposition report. *Id.* at 756-57; *Alaka W.*, 379 Ill. App. 3d at 271; *In re Daniel M.*, 387 Ill. App. 3d 418, 422 (2008). The State's failure to provide a proper predisposition report or equivalent testimony severely prejudiced Marcus, and Marcus's counsel's failure to object to this error constituted ineffective assistance.

¶ 39    Finally, as noted above, the State did not prove that Marcus was provided with all of the statutorily required written information on the side effects, risks, benefits, and alternatives to each of the 27 medications requested by the State. Marcus's counsel's failure to object to the State's lack of evidence on this dispositive issue was also ineffective assistance. Marcus had a due process right not to be medicated on an involuntary basis unless the State proved that he lacked the capacity to make a reasoned decision about his own medical treatment. The State could not prove that Marcus lacked that capacity without first demonstrating that he had received all of the information required by the Code as to each proposed medication. 405 ILCS 5/2-102(a-

5) (West 2016)). By failing to object to the State's failure of proof on this issue, Marcus's counsel failed to protect Marcus's fundamental due process right, thereby depriving him of a fair trial.

¶ 40                                    4. Forfeiture

¶ 41          The State argues that any objections to the errors it allegedly committed in this case were forfeited because Marcus's counsel did not object to any of the errors before the trial court and he does not argue that they are reviewable under the plain error doctrine. These arguments fail. Forfeiture is a limitation on the parties, not the reviewing court. *In re Amanda H.*, 2017 IL App (3d) 150164, ¶ 43. Finding forfeiture would be inappropriate in this case given the State's complete failure to observe the Code's mandatory provisions that safeguard the respondent's liberty and due process rights. If a respondent fails to object to violations of the Code committed by the State, he may not appeal the State's lack of "strict compliance" with the Code; however, he retains the right to appeal the State's *total noncompliance* with those requirements. *Id.* Cases finding forfeiture of procedural errors in involuntary commitment or medication proceedings under the Code usually involve errors that were harmless under the circumstances presented. See, *e.g.*, *In re Nau*, 153 Ill. 2d 406 (1992) (counsel's failure to object to allegedly improper notice of involuntary commitment hearing forfeited the issue where the respondent actually appeared at the hearing with his counsel, thereby negating any claim of prejudice). However, the errors committed in this case cannot be said to be harmless, and our appellate court has held that some of the errors alleged in this case cannot be forfeited. See, *e.g.*, *In re Robin C.*, 395 Ill. App. 3d 958, 965 (2009) (holding that the State's total failure to meet section 3-810 requirements regarding a predisposition report is an error that is "neither harmless nor forfeited"); *Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 14 (holding that the State's failure to prove that the respondent

16

received complete written information as to all the risks and benefits of each requested medication and alternatives thereto could not be forfeited).

¶ 42                                    5. Mootness

¶ 43        The State also argues that we should dismiss this appeal as moot. The involuntary commitment and medication orders at issue in this appeal expired by their own terms 90 days after they were entered. Thus, both orders are now moot.

¶ 44        Generally, courts of review do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected by the court's decision. *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009). However, there are three established exceptions to the mootness doctrine: (1) the "public interest" exception, applicable where the case presents a question of public importance that will likely recur and whose answer will guide public officers in the performance of their duties; (2) the "capable of repetition" exception, applicable to cases involving events of short duration that are capable of repetition, yet evading review; and (3) the "collateral consequences exception," applicable where the involuntary treatment order could return to plague the respondent in some future proceedings or could affect other aspects of the respondent's life. *Id.* at 355-62. Whether a particular appeal falls within one of these exceptions to the mootness doctrine must be determined on a case-by-case basis, considering each exception in light of the relevant facts and legal claims raised in the appeal. *Id.* at 364; *Daryll C.*, 401 Ill. App. 3d at 752.

¶ 45        We find that the "capable of repetition" exception applies in this case. That exception has two elements. First, the challenged action "must be of a duration too short to be fully litigated prior to its cessation." *Alfred H.H.*, 233 Ill. 2d. at 358. Second, "there must be a reasonable expectation that 'the same complaining party would be subjected to the same action again.' " *Id.*

17

(quoting *Barbara H.*, 183 Ill. 2d at 491). In the present case, there is no question that the first element has been met. As noted, the challenged orders were limited to 90 days, and the parties agree that the orders could not have been fully litigated prior to their cessation.

¶ 46        Thus, the only question is whether there is a reasonable expectation that Marcus will personally be subject to the same action again. That occurs when the resolution of the issue raised in the present case would be likely to affect a future case involving Marcus or to "have some bearing on a similar issue presented in a subsequent case" involving Marcus. *Id.* at 359, 360; see also *Wilma T.*, 2018 IL App (3d) 170155.

¶ 47        This evidence in this case satisfies that standard. Because of Marcus's history of mental illness and involuntary hospitalizations, it is reasonably likely that he will face additional involuntary admission and medication orders in the future. Indeed, he faced such additional orders in La Salle County only 32 days after the orders at issue in this case were entered. Those La Salle County circuit court orders are the subject of *In re Marcus. S.*, 2022 IL App (3d) 170014. In that case, the trial court repeated many of the same errors at issue in the instant case.[2] That makes the argument for review under the "capable of repetition" exception particularly strong in this case. *Wilma T.*, 2018 IL App (3d) 170155, ¶ 14 (taking judicial notice of prior involuntary commitment case wherein the same error was committed and ruling that "[t]he fact that the same problem has affected respondent twice shows that this issue could affect her again

---

[2] We may take judicial notice of the record in another case involving the same party or of public documents contained in the record of any other judicial proceeding if doing so would aid us in deciding the instant case. *Wilma T.*, 2018 IL App (3d) 170155, ¶ 14 (taking judicial notice of prior involuntary commitment case involving the same respondent and the same error); see also *Metropolitan Life Insurance Co. v. American National Bank & Trust Co.*, 288 Ill. App. 3d 760, 764 (1997); *People v. Davis*, 65 Ill. 2d 157, 161 (1976). We may do so *sua sponte, i.e.*, even if the parties did not seek judicial notice in the trial court. *In re N.G.*, 2018 IL 121939, ¶ 32; *State Farm Fire & Casualty Co. v. Watts Regulator Co.*, 2016 IL App (2d) 160275, ¶ 40.

in future proceedings"); see generally *In re Eric H.*, 399 Ill. App. 3d 831, 833 (2010) (applying "public interest" mootness exception in consolidated mental health appeals and finding that the fact that the trial court repeated the same course in successive petitions suggested "the likelihood of a recurrence").

¶ 48        As Marcus correctly notes, the State and the trial court failed to comply with certain procedural and substantive requirements of the Code. For example, the trial court erred by granting the involuntary medication petition even though the State (1) failed to present evidence that Marcus had received written notice of the risks and benefits of, and alternatives to, the proposed medications, as required by section 2-102(a-5) of the Code (405 ILCS 5/2-102(a-5) (West 2016)), and (2) failed to demonstrate by clear and convincing evidence that the Marcus lacked the capacity to make a reasoned decision about his medical treatment, as required by section 2-107.1(a-5)(4)(E) of the Code (*id.* § 2-107.1(a-5)(4)(E) (West 2016)). The trial court also erred by granting the involuntary commitment petition even though (1) the petition did not include the names of any of Marcus's relatives or information as to why they could not be contacted, as required by section 3-601(b)(2) of the Code (*id*. § 3-601(b)(2)), and (2) the State failed to file a predisposition report as required by section 3-801 of the Code (*id*. § 3-810) or to present oral testimony containing the information required by that section (see *Daryll C.*, 401 Ill. App. 3d at 755-57). The trial court also erred by granting the petitions even though Marcus's counsel provided ineffective assistance and by failing to advise Marcus of his appeal rights. It is reasonably likely that the resolution of these issues will affect future cases involving Marcus because he will likely again be subject to involuntary commitment and medication, the trial court will likely again commit the same statutory compliance issues, and counsel for both parties will likely commit the same errors. See *Wilma T.*, 2018 IL App (3d) 170155, ¶ 14 ("[t]he fact that the

19

same problem has affected respondent twice shows that this issue could affect her again in future proceedings"); *In re Val Q.*, 396 Ill. App. 3d 155, 161 (2009) (applying the "capable of repetition" exception and finding it reasonably likely that the resolution of an issue "would affect future cases involving respondent, because respondent will likely again be subject to involuntary treatment and the court will likely again commit the same alleged error"), *overruled on other grounds by In re Rita P.*, 2014 IL 115798, ¶¶ 33-34; *Tara S.*, 2017 IL App (3d) 160357, ¶ 17 (applying the "capable of repetition" exception to claim of ineffective assistance of counsel in proceedings under the Code). In fact, that is exactly what happened merely weeks later in the La Salle County case. Accordingly, the "capable of repetition" exception to the mootness doctrine applies here.

¶ 49    The State argues that the "capable of repetition" exception does not apply here because the respondent is arguing only that the evidence was insufficient to support the involuntary admission and medication orders in this case. The State and the dissent are correct that fact-specific arguments (such as an argument addressing the sufficiency of the evidence in a given case) are not subject to the "capable of repetition" exception because such issues are unlikely to recur in future cases and the resolution of such issues will not impact future cases. *Alfred H.H.*, 233 Ill. 2d at 359-61. Contrary to the State's and the dissent's assertions, however, the instant appeal does not merely involve challenges to the sufficiency of the evidence or any other fact-specific issue. Rather, it involves the State's complete failure to observe several mandatory procedural and substantive requirements of the Code and Marcus's counsel's ineffectiveness for failing to object to such failures. Our appellate court has repeatedly recognized that the "capable of repetition" exception applies under these circumstances. See, *e.g.*, *Wilma T.*, 2018 IL App (3d) 170155, ¶ 14; *Val Q.*, 396 Ill. App. 3d at 161; *Tara S.*, 2017 IL App (3d) 160357, ¶ 17.

20

¶ 50 Because we hold that the "capable of repetition" exception to mootness applies, we do not need to address Marcus's argument that the "public interest exception" also applies.

¶ 51 We close by admonishing trial courts, the state's attorney, and all counsel who represent respondents in involuntary commitment and treatment proceedings to do better in future cases. Unfortunately, this is far from the first time we have encountered such a brazen disregard for the law in civil commitment cases. Our appellate court has repeatedly stressed the need for strict compliance with the legislatively established procedural safeguards for involuntary commitment proceedings. See, *e.g.*, *Alaka W.*, 379 Ill. App. 3d at 271-72; *Daniel M.*, 387 Ill. App. 3d at 422-23; *Amanda H.*, 2017 IL App (3d) 15016, ¶ 46. Nevertheless, our admonitions continue to go unheeded, and fundamental errors and omissions recur with disturbing regularity. This threatens to render involuntary commitment and treatment proceedings, which involve massive intrusions on respondents' liberty, *pro forma* proceedings. That cannot be tolerated. We hope that our supreme court will act to stop to these continuing, egregious violations of respondents' constitutional and statutory rights in these cases. Our supreme court could, for example, require that all trial courts presiding over these cases, attorneys in the state's attorney's office, attorneys in the legal advocacy service, and any other counsel representing respondents in these cases receive adequate training as to the Code's requirements in order to ensure that such requirements are fully observed and strictly enforced.

¶ 52                                   CONCLUSION

¶ 53 For the foregoing reasons, we reverse the judgment of the circuit court of Peoria County.

¶ 54 Reversed.

¶ 55 JUSTICE SCHMIDT, dissenting:

¶ 56    While the majority's concerns are well founded, we are bound by our supreme court's admonishment not to decide moot questions. *Alfred H.H.*, 233 Ill. 2d at 351. The majority finds that this case falls within the "capable of repetition, yet evading review" exception to the mootness doctrine. *Supra* ¶ 45. This exception has two elements: (1) the challenged action is in its duration too short to be fully litigated prior to its cessation and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again. *In re A Minor*, 127 Ill. 2d 247, 258 (1989).

¶ 57    The first element is satisfied. However, the second element is not. The fact that respondent may face involuntary admission and involuntary medication in the future is not a sufficient basis to satisfy the second element of this exception to the mootness doctrine. *Alfred H.H.*, 233 Ill. 2d at 358-61. Respondent is not arguing that any statute is unconstitutional, and he may be subjected to the same unconstitutional statute in the future. Nor does he challenge the trial court's interpretation of a statute. He argues only that the trial court and the State failed to follow certain statutory procedures, and his counsel was ineffective for failing to object to the failure to follow the procedures. His argument is fact-specific. There is no clear indication of how a resolution of the issues raised in this case could be of use to respondent in a future litigation as any future litigation would be based upon new petitions, new hearings, new evidence, and an assessment of whether the State met its burden of proof in those cases. See *id.* at 360 (making a similar statement about the argument raised in that case). Nothing in the majority's opinion constitutes anything other than a recitation of existing case law. In other words, the majority opinion does not offer any new guidance to be used in the future by litigants. While it is troubling that the court and parties below appear to repeatedly disregard procedural

requirements in involuntary commitment proceedings, there is no justification for issuing a new opinion, which applies already existing law to the facts of this case.

¶ 58    The majority finds the above exception to the mootness doctrine is satisfied and does not address the alternative mootness exception raised by respondent on appeal. Specifically, respondent argues that the public interest exception to the mootness doctrine is also satisfied. This argument should be rejected as well.

¶ 59    The public interest exception is applicable only if there is a clear showing that (1) the question is of a substantial public nature, (2) an authoritative determination is needed for future guidance, and (3) the circumstances are likely to recur. *In re J.B.*, 204 Ill. 2d 382, 387 (2003). The exception is narrowly construed and requires a clear showing of each criterion. *In re India B.*, 202 Ill. 2d 522, 543 (2002). The second element is not satisfied in this case. This exception does not apply when there are no conflicting precedents requiring an authoritative resolution. The majority does not resolve any conflicting issues in the law. Rather, it applies existing case law to the specific facts of this case. Therefore, an authoritative determination is not necessary as required by this exception.

¶ 60    This appeal should be dismissed as moot.