2022 IL App (2d) 220012-U
No. 2-22-0012
Order filed September 7, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* ESTATE of GRACE MUNOZ, a Disabled Adult, | ) ) ) ) ) ) | Appeal from the Circuit Court of Kane County. <br><br> No. 11 P 384 |
| (Alex G. Munoz, Petitioner-Appellant v. Ileana Munoz-Unruh and Adolf Munoz, Respondents-Appellees). | ) ) ) | Honorable Joseph M. Grady Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*: We lack jurisdiction to address the appellant's claims that the trial court erred in revoking a power of attorney for healthcare and in ordering him to pay certain fees and expenses.  The trial court did not abuse its discretion in denying the appellant's petition to move his disabled wife from the marital residence or his petition to terminate, remove the trustee, or compel partial liquidation of his disabled wife's irrevocable trust.

¶ 2   At issue in this appeal are various orders of the trial court in a guardianship proceeding involving a disabled adult, Grace Munoz.  In this appeal, Grace's husband, Alex Munoz, appeals from orders denying his request to sell the marital residence, revoking his power of attorney for healthcare, denying his petition to terminate Grace's irrevocable trust, and orders requiring him to

personally pay for Grace's expenses and attorney fees incurred in the proceedings. We affirm in part and dismiss in part.

¶ 3                                    I. BACKGROUND

¶ 4       Alex and Grace have been married for more than 65 years and have six children: Ileana, Rebeca, Vivian, Alexander, Gregory, and Adolf. Grace was born July 12, 1938. Over the course of the marriage, the couple accumulated a sizeable estate. In 2003 and 2004, they developed a comprehensive estate plan that involved placing their assets in various trusts. One of the trusts they established, the Grace Ramirez Munoz Declaration of Living Trust (Grace's Living Trust), dated June 27, 2003, held the couple's longtime personal residence in Sleepy Hollow (the marital residence). The marital residence is an 8,000 square foot home with six bedrooms, six bathrooms, and an indoor pool. Grace was the trustee of the trust and Alex was the sole successor trustee in the event of Grace's death or inability to manage her own affairs.

¶ 5       A third amendment and restatement of Grace's Living Trust provided that the trustee could use any income and the principal of the trust to provide for Grace's support, care, or any other purpose that was in her best interest. The trustee had the authority to exhaust the principal of the trust if necessary. The trustee also had the power to sell the trust property, to invest and reinvest trust property, to borrow money and pledge the property in the Trust, and to terminate the trust and distribute the trust property if continuation of the Trust was no longer economically beneficial.

¶ 6       The couple also executed a second trust, designated as the Grace Ramirez Munoz Irrevocable Trust Agreement Dated August 30, 2006 (Grace's Irrevocable Trust). The parties placed an income generating property into that trust, namely a property on Swift Road in Addison (Swift Road property). The Swift Road property was rented out for open storage and collected rents from two cell tower leases. The parties' son, Adolf, was named the trustee and Itasca Bank

& Trust Company was the successor trustee. The trust was created as an incoming-producing trust for Grace's lifetime care. Specifically, Article IV, Section 1 of the trust provided that the trustee "shall pay the income and may pay such sums from the principal of the Trust Estates, considering other sources of income available to [Grace], as the Trustee deems necessary for [her] care, support and comfort." Section 1 further provided that the trustee was "authorized to enter into a contract to provide lifetime care for [Grace] *** even to the extent of exhausting the Trust Estate." Article IV, Section 2 provided that, upon Grace's death, the trustee was to pay the net income from the trust to Alex.

¶ 7    Article VII, Section 1(g) of Grace's Irrevocable Trust provided that, in determining the necessary amount of support, the trustee could consider: "(1) the standard of living to which such person is accustomed; (2) his obligations, if any, to support others; (3) the obligation, if any, and the ability of others to support him; and (4) other income and financial resources available to him which are known to the trustee." Article VIII, Section 2, further provided that:

> "So long as [Adolf] is serving as Trustee, hereunder, he shall determine whether the Swift Road [property] shall remain an asset of the Trust or when it shall be sold. So long as the Swift Road [property] is an asset of the Trust, [Adolf] may, at his election, serve as its manager at reasonable rates of compensation consistent with our past practices and Agreement. [Adolf's] service as Trustee hereunder shall not prohibit him from providing the management services for reasonable compensation. I intend that the Trustee shall continue to operate the Swift Road [property] as the primary asset and investment of this Trust for so long as the Trustee considers it reasonable to do so."

Article VIII, Section 6, provided that the trustee could exercise his powers without order of any court and as the trustee determined to be in the best interest of the beneficiaries. The trustee's

powers included the authority to invest in and retain any trust property and to sell any trust property. The record also indicates that Grace and Alex established a special needs trust for their disabled daughter, Rebeca.

¶ 8     On June 27, 2003, Grace executed a power of attorney for healthcare naming Alex as the primary agent. On April 1, 2010, Grace executed a power of attorney for property, also designating Alex as her agent. Shortly thereafter, Grace began exhibiting signs of dementia. It is undisputed that Grace is currently disabled with end-stage dementia and incapable of making financial and medical decisions. Since 2011, Grace has required full-time round the clock care either at the marital residence or in an assisted living or skilled nursing facility.

¶ 9     On August 8, 2011, Senior Services Associates, Inc., filed a petition for the adjudication of disability and the appointment of a plenary guardian for Grace because she was unable to handle her affairs. In that petition, it was alleged that, while Grace was residing at the Sunrise of Bloomingdale Memory Care Center, Alex was observed shaking Grace roughly to awaken her and pinching her nose shut to force feed her. Alex also got into a physical altercation with his son Greg and they knocked into Grace causing bruising on her leg. It was also alleged that Alex's girlfriend was living at the marital residence and that it was causing Grace agitation and anxiety. Finally, the petition alleged that, while Grace needed round the clock care, Alex refused to hire someone to care for her at home between 8 p.m. and 8 a.m. On that same date, the trial court appointed a guardian *ad litem* (Douglas Scheflow) and a temporary guardian of the person and estate of Grace (Christine Adelman). Scheflow subsequently filed a written report indicating, in relevant part, that there was family discord over Alex's girlfriend living in the marital residence and recommending that the girlfriend be barred from coming near the marital residence.

¶ 10    On November 14, 2011, following the filing of various motions, an agreed order was entered amending the temporary guardianship to name Adelman as Grace's limited guardian of the person. Adelman was given power to visit Grace in her home, access her medical records, and consult with medical care providers. The agreed order also indicated that Adelman's consent would be required before Grace could be moved to any other residence or healthcare facility but that Alex still had the power to execute day-to-day healthcare decisions for Grace under the power of attorney for healthcare. The parties agreed that Alex's girlfriend would no longer reside in the marital residence.

¶ 11    On July 14, 2014, Alex filed a petition to move Grace from the marital residence to a location where she could be closer to her children. Alex noted that Grace's primary care physician, her hospice care manager, and her social worker all opined that such a move would have no negative impact on Grace's condition. Alex also noted that the marital residence was extremely expensive to maintain. Alex explained that he was seeking permission from the trial court because Adelman had refused to consent to moving Grace. On July 22, 2014, the trial court granted Alex's petition.

¶ 12    On August 5, 2014, Grace's daughter, Vivian, filed a motion to vacate the July 2014 order. Vivian alleged that none of Grace's children were notified of the petition to move Grace. Vivian opined that moving Grace would be detrimental to Grace's health. Adelman agreed that Grace wanted to stay in her marital home. Further, Alex wanted to move Grace farther away from two of the children that visited Grace regularly each week. Vivian alleged that Grace's Irrevocable Trust provided more than sufficient income for Grace to remain in the marital residence.

¶ 13    On September 5, 2014, following a hearing, the trial court vacated the July 2014 order. The trial court noted that Adelman, Vivian, and Adolf all agreed that moving Grace would have a

negative impact on her. Further, Adolf indicated that Grace's Irrevocable Trust provided sufficient funds for Grace to remain in the marital home. The trial court's order specifically stated that Grace would continue to reside in the marital residence "pending further order of the court."

¶ 14    On February 3, 2017, Adelman filed a petition for the trial court to appoint a successor limited guardian because she was unable to continue to fulfill her role. Ileana, Vivian, and Adolf subsequently filed individual petitions to be appointed as Grace's plenary guardian of the person.

¶ 15    On May 18, 2017, following a hearing, the trial court entered an order discharging Adelman as limited guardian. The trial court appointed Ileana and Adolf as limited co-guardians of Grace with the power to visit Grace, access her medical records, and consult with her medical providers. Vivian's petition was denied. The trial court reiterated that Grace could not be moved to any other residence without court approval. Further, the trial court noted that its order did not otherwise limit or terminate Alex's agency as power of attorney for Grace's healthcare. Finally, the order indicated that the parties agreed that Alex's girlfriend would not reside in or visit the marital residence.

¶ 16    On January 8, 2021, Alex filed a petition for instructions, which requested guidance on how to move Grace to a qualified healthcare facility so that Alex could sell the marital residence. Alex alleged that Adolf had sold the property held in Grace's Irrevocable Trust (the Swift Road property) and had reinvested the proceeds in other rental properties. Prior to the sale, the irrevocable trust was generating hundreds of thousands of dollars every year but in 2020 it had only generated $6000. Alex alleged that selling the marital residence was necessary to free up funds for Grace's long-term care. Alex alleged that as the sole trustee of Grace's Living Trust and as the power of attorney for property he had the authority to sell the residence. He was seeking trial court permission knowing that the guardians would object to selling the residence as it would

involve moving Grace to an alternate living space. Ileana and Adolf both filed responses, arguing that Alex had the resources to maintain the marital residence and that it was not in Grace's best interest to be moved.

¶ 17    On March 24, 2021, following a hearing, the trial court denied Alex's petition. The trial court's order reiterated that Grace could not be moved without court approval. The record does not contain a transcript or a bystander's report from this hearing.

¶ 18    On April 12, 2021, Adolf filed a motion to compel, stating that he had propounded written discovery on Alex in an attempt to learn what other resources were available to pay the expenses for Grace's support. However, Alex had not fully answered or produced documents as requested. Adolf argued that the information he requested was necessary to properly evaluate Alex's assertions that he had insufficient funds to provide for Grace's care without selling Grace's home. Adolf requested the court to enter an order compelling Alex to fully comply with discovery.

¶ 19    On April 13, 2021, Ileana filed a motion to revoke Alex's power of attorney for healthcare and appoint the limited guardians as plenary guardians of the person. Ileana alleged that Alex had intentions to move Grace into his home and have his girlfriend provide care for Grace. Ileana also alleged that Alex's girlfriend was entering the marital residence in violation of the trial court's order. Ileana alleged that Alex was not acting in the best interests of Grace, that his power of attorney for healthcare should be revoked, that Ileana and Adolf should be appointed co-plenary guardians of the person, and that Alex should be ordered to continue to pay for Grace's caregivers.

¶ 20    On April 21, 2021, following a hearing, the trial court granted Ileana's motion. The trial court revoked Alex's power of attorney for healthcare and appointed Ileana and Adolf as plenary co-guardians of the Grace, each with the authority to act independently. The record does not include a transcript or a bystander's report from this hearing.

¶ 21    On May 20, 2021, Ileana filed a motion, on behalf of Grace, for spousal support.  Ileana alleged that Alex wrote a letter to his children essentially stating that Grace was nearly out of money and that all future expenses would be the responsibility of Adolf, as trustee for Grace's Irrevocable Trust.  Ileana alleged that spouses are responsible for each other's expenses and debts and that Alex and Grace still had at least $800,000 in retirement accounts and other assets.  Ileana argued that there was no basis for Alex to refuse to pay for Grace's caregiver expenses and other expenses of the marital residence.  Ileana requested that Alex be ordered to continue to pay for the caregiver and household expenses of Grace.  On that same date, Ileana's attorney filed a petition for attorney fees requesting that Alex be ordered to pay his attorney fees.

¶ 22    On May 25, 2021, the trial court continued the motion for spousal support and ordered that Alex should continue to pay for Grace's caregiver and other household expenses until further order of the court.  The record does not contain a transcript or a bystander's report from this hearing.

¶ 23    On June 14, 2021, Alex filed a petition to terminate Grace's Irrevocable Trust through liquidation or, alternatively, to remove Adolf as trustee and order partial liquidation.  Alex alleged that Adolf sold the Swift Road property and purchased new investment properties.  Prior to the sale of the Swift Road property, Grace's Irrevocable Trust consistently generated over $100,000 in annual income for Grace.  That income, combined with Grace's social security, was sufficient for Alex to pay Grace's expenses including living expenses, full-time caregiver expenses, and upkeep of the marital residence.  Since Adolf sold the Swift Road property and reinvested in rental properties, the income from the irrevocable trust diminished such that $47,000 was distributed for Grace's care in 2019 and only $9000 in 2020.  Alex alleged that he was required to open a home equity line of credit and take a substantial loan from the separate trust for Rebeca, his disabled daughter, in order to pay Grace's expenses.  Alex argued that the irrevocable trust should be

terminated and liquidated to provide funds for Grace's care. Alternatively, Alex argued that Adolf should be ordered to partially liquidate the trust or be removed as trustee.

¶ 24    On June 15, 2021, Alex filed a response to Ileana's motion for spousal support. Alex argued that a spouse is not entitled to common law spousal support unless he or she can show that there is a "need." Alex argued that there was no need because Grace's trusts were set up to provide for her care and support. Alex noted that the trial court refused his request to move Grace so that he could liquidate the marital residence. He argued that this improperly rewrote the trust language. Alex argued that the only alternative was to force Adolf to liquidate some assets in the irrevocable trust to provide for Grace's support. He noted that his children were trying to force him to liquidate his own assets to provide for Grace's care so that they could preserve Grace's assets as they were due to inherit those assets.

¶ 25    On July 14, 2021, a non-evidentiary hearing was held at which the parties' attorneys provided argument. The record includes a transcript from this hearing. The parties initially argued about discovery. Adolf asserted that, even though he was doing his best to get the income from the irrevocable trust back up to prior levels, the purpose of discovery was to figure out what other assets were available to provide for Grace's care. Adolf asserted that he needed all of Alex's and Grace's financial information requested in discovery so that the parties can have the "full-fledged hearing that we're going to need to have." Adolf also stated that he needed to have all his discovery answered before he could formally file a response to the petition to terminate the irrevocable trust.

¶ 26    As to spousal support, Alex explained that twenty years prior, he and Grace had divided their assets. He gave her over $3 million in property and took even less for himself. Alex asserted that this was her spousal support—the $1 million-dollar marital residence and the $2 million worth

of property in the irrevocable trust. Alex asserted that spousal support was improper unless there was a showing of "need" and they could not show this because Grace's trusts contained sufficient assets to provide for her care. Alex noted that the cell tower leases on the Swift Road property generated $70,000 in annual income. Alex argued that the reason Adolf sold the Swift Road property was because he could not take management fees from the cell tower leases. Alex asserted that Adolf should have sold the property and, rather than reinvest the proceeds in alternate properties, Adolf should have left the proceeds liquid so that they could be used to provide care for Grace.

¶ 27 Adolf responded that he had to sell the Swift Road property because he received a notice from Du Page County that its use for open storage violated a zoning ordinance. Adolf filed a petition to get the proper zoning but he was not successful. If he had sold the Swift Road property and not reinvested the proceeds, the trust would have incurred $400,000 in capital gains tax. Adolf acknowledged that the income from the irrevocable trust had diminished, but he stated that the new investment properties were starting to generate income again. Ileana and Adolf argued that even though assets were placed in various trusts, only the assets in the irrevocable trusts were considered gifts and thus nonmarital. All the other marital assets, even those in Alex's name, were still marital assets that Alex should be required to use for Grace's care.

¶ 28 On July 15, 2021, the trial court entered a written order. The trial court ordered Alex to pay Ileana's attorney fees and granted the motion for spousal support but stated that the attorney fees and spousal support were "subject to possible reallocation" at a future date. The trial court continued Adolf's motion to compel and ordered Adolf and Alex's attorneys to meet in person and resolve outstanding discovery disputes. The trial court set a date for hearing on Alex's petition to terminate the irrevocable trust.

¶ 29    On August 24, 2021, another non-evidentiary hearing was held and the record includes a transcript from this hearing. The parties' attorneys presented the following arguments. Adolf argued that if the trial court was really considering terminating the irrevocable trust, then all the beneficiaries needed to be notified so that they could have an opportunity to be heard on the issue. Alex agreed that it would be appropriate to have all the beneficiaries present.

¶ 30    Adolf's attorney stated that if the trial court was considering terminating the trust and pooling together Alex and Grace's assets and then splitting them up again, that discovery was still not complete and it would be premature to have a hearing for such purpose. Adolf noted that he needed to know what other assets were available for Grace's care when deciding how to manage the irrevocable trust. He believed that the irrevocable trust generated income for many years that was far and above what was actually needed to provide for Grace.

¶ 31    Alex objected and stated that between full-time caretakers and property taxes the irrevocable trust did not provide excess funds each year. Alex argued that the only funds available for Grace's care were her social security and any income from the trusts. He argued that the fundamental problem was that the irrevocable trust was no longer generating sufficient income. He noted that the irrevocable trust generated $130,000 in 2017 but less than $10,000 in 2020. Alex argued that the irrevocable trust was created to care for Grace and if her care and well-being was the primary concern, then the simple solution was to dissolve the trust and sell some assets. Alex further argued that his assets were irrelevant when Grace's trusts, if there was some liquidation, could provide for her care and support. He stated that the vast majority of he and Grace's assets were held in the irrevocable trust.

¶ 32    Ileana argued that any assets held by Alex were still marital assets that could be used to provide for Grace's expenses. She noted that Alex borrowed money from Rebeca's special needs

trust to pay for Grace's care. Ileana argued that this was not necessary because Alex had sufficient other marital assets to provide for Grace's care.

¶ 33    The trial court asked what happened to the cell towers when the Swift Road property was sold. Adolf explained that the cell towers were sold with the property. When sold, Adolf did a 1031 exchange and purchased two three-unit residential buildings and a five-unit commercial building. It took some time to prepare the Swift Road property for sale. In addition to the cell towers, it was being rented for open storage. There were 40 tenants that they had to track down and evict in order for the property to be sold. During that time, the rent started to decrease. When it was sold, there was no income during the time it took to purchase the new properties, which was about six months.

¶ 34    The trial court asked whether Adolf violated his fiduciary duty. Adolf argued that he had not because the income was starting to come back and the property he purchased was still worth $2 million dollars. Further, the fact that the Swift Road property was not properly zoned and could no longer be used was not within Adolf's control. He did the best he could with that condition and reinvesting the proceeds. Adolf argued that he had preserved the value of the trust and that Grace had always been taken care of. He argued that Alex had sufficient other marital assets to care for Grace during the short time the irrevocable trust was not generating funds.

¶ 35    Alex argued that while the income decreased, Adolf was taking more in management fees than he was disbursing for Grace's care. Further, if Adolf's main concern was providing funds to care for Grace, he should have liquidated part of the irrevocable trust and put the money in an account for Grace, but Adolf refused to do so. Adolf argued that the trust gave him the right to take a fee and if the trial court believed the fee was not reasonable, then it could modify the fee. Adolf explained that it took considerable time to search for replacement investment properties and

do all the research involved. He had a duty to manage and preserve the trust property and he was entitled to a fee for his time and energy. He had to reinvest the proceeds from the Swift Road property to avoid a significant estate tax.

¶ 36    Following arguments, the trial court denied the motion to terminate the irrevocable trust, to remove Adolf as trustee, or to compel partial liquidation. The trial court noted that it was not ready yet to disrupt Alex and Grace's estate plan and that it wanted to honor what they planned for themselves and their heirs. The trial court stated that it expected the income on the irrevocable trust to improve and to start providing more income for Grace's care. The trial court stated that a larger portion of the income should go toward Grace's care as opposed to fees. The trial court noted that this might satisfy everyone. The trial court also stated that, at some point in the future, it could consider whether "principal can be used" to provide for Grace's care and support. The trial court also stated it was not inclined to replace the trustee unless there was evidence of misconduct or mismanagement. Thereafter, Adolf stated that since there were no other pending matters, he was withdrawing his motion to compel. The trial court entered a written order denying the motion to terminate the irrevocable trust and stating that, with Adolf's withdrawal of his motion to compel, there were no other issues pending before the court.

¶ 37    On September 23, 2021, Alex filed a motion to reconsider. Alex argued that, in denying his motion to move Grace and sell the marital residence, the trial court improperly modified Grace's Living Trust, as that trust specifically gave Alex the power, as trustee, to sell the estate to provide for her lifetime care. Alex further argued that the trial court erred in revoking his power of attorney for healthcare without making a specific finding that he did not act for the benefit of Grace or that he caused substantial harm to her person or property. Finally, Alex argued that the trial court erred in (1) ordering him to pay for Grace's expenses without a finding of "need;" (2)

ordering him to personally pay Ileana's attorney fees when sufficient assets existed in Grace's trusts to pay the fees; and (3) denying his petition to terminate the irrevocable trust without holding an evidentiary hearing and because Adolf clearly breached his fiduciary duty as trustee.

¶ 38    On December 10, 2021, following a hearing, the trial court denied the motion to reconsider. There is no transcript of proceedings or bystander's report from this hearing included in the record. On December 28, 2021, the trial court ordered Alex to pay Ileana's attorney fees from Grace's estate to the extent there were assets available and if not, to pay from his own assets. The trial court stated that the fees were subject to possible reallocation at a later date. On January 7, 2022, Alex filed a notice of appeal.

¶ 39                                    II. ANALYSIS

¶ 40    Alex's first contention on appeal is that the trial court erred in denying his January 2021 petition to move Grace to an alternate residence because, in doing so, the trial court essentially modified Grace's Living Trust by eliminating his power, as trustee, to sell the property. Alex also argues that the trial court's order interfered with his authority as Grace's power of attorney for healthcare.

¶ 41    At the outset, we note that Adolf argues that the trial court's March 2021 denial of Alex's petition was a final order that was immediately appealable and, thus, this court lacks jurisdiction to address this argument. Illinois Supreme Court Rule 304(b)(1) (eff. Mar. 8, 2016), provides for appeals from "[a] judgment or order entered in the administration of an estate, guardianship, or similar proceeding which finally determines a right or status of a party." The relevant committee comments on Rule 304 provide that subparagraph (b)(1) "applies to orders that are final in character although entered in comprehensive proceedings that include other matters," with

examples including appointing or removing an executor, or allowing or disallowing a claim. Ill. S. Ct. R. 304(b)(1), Committee Comments (rev. Sept 1988).

¶ 42    Importantly, Rule 304(b)(1) requires an immediate appeal. Ill. S. Ct. R. 304(b) (the time to file an appeal under Rule 304(b) is provided by Rule 303). Appeals pursuant to Rule 304(b)(1) are mandatory: when an order falls within the scope of the rule, it must be appealed within 30 days of entry. *In re Estate of Devey*, 239 Ill. App. 3d 630, 633 (1993). The mandatory nature of a Rule 304(b)(1) appeal "promotes efficiency and provides certainty *** during the lengthy procedure of estate administration." *Id.* Certainty is a necessity in lengthy estate administrations. *In re Estate of Kime*, 95 Ill. App. 3d 262, 268 (1981). Without the mandatory nature of such appeals, a party could wait to appeal the denial of a petition to remove an executor until years later and, if successful, effectively begin again the entire estate administration. *Id.* Thus, when an order is appealable under Rule 304(b), any claim of error is lost if not raised immediately. *Washington Mutual Bank, F.A. v. Archer Bank*, 385 Ill. App. 3d 427, 430 (2008).

¶ 43    In the present case, the trial court's March 2021 order denying Alex's petition to move Grace stated that "Grace shall not be moved at this time." This order was not immediately appealable under Rule 304(b) because it did not finally determine Alex's right on this issue. The trial court's language specifically indicated that the issue could be revisited. In fact, the issue had been addressed numerous times over the course of the proceedings. In 2011, the parties entered an agreed order stating that Grace could not be moved without the consent of her guardian. In 2014, Alex filed his first petition to move Grace. In May 2017, the trial court entered an order that Grace could only be moved with leave of court. Accordingly, the trial court's March 2021 order at issue was not immediately appealable as the trial court's language indicated that the matter could be revisited if circumstances changed. Accordingly, the order denying Alex's petition to move

Grace did not finally determine his right to do so and was, therefore, not immediately appealable under Rule 304(b)(1). See *Stephen v. Huckaba*, 361 Ill. App. 3d 1047, 1051 (2005) (to "fit within Rule 304(b)(1)," the order "must resolve all matters on the particular issue"). As such, we have jurisdiction to address this issue.

¶ 44    Turning to the merits, on the record before us we cannot say that the trial court erred in denying Alex's petition to move Grace. The parties do not dispute that the trial court's order denying the petition to move Grace should be reviewed for an abuse of discretion. The trial court has the authority to modify a trust (760 ILCS 3/412 (West 2020)) and to take action to protect the best interest of a disabled person even though matters are covered by a power of attorney (*In re Hatsuye T.*, 293 Ill. App. 3d 1046, 1051 (1997)). A best interest determination is generally reviewed for an abuse of discretion. *In re G.L.*, 329 Ill. App. 3d 18, 25 (2002).

¶ 45    Alex has failed to provide an adequate record for us to review this issue. In general, it is presumed that a trial court's judgment "was in conformity with law and had a sufficient factual basis." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). An appellant can overcome this presumption only by supporting his claim of error with "a sufficiently complete record of the proceedings at trial." *Id.* at 391. "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Id.* at 392. As one court has noted, this rule is "especially" important "when the abuse-of-discretion standard applies," because knowing the basis of the court's order is essential to assessing whether the discretion exercised was abused. *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 22. Here, Alex has failed to include a transcript of the hearing on his January 2021 petition to move Grace. In the absence of that transcript, we do not know what evidence or arguments were presented and we must presume that the trial court's order was supported by law. *Id.* As such, we affirm the trial court's determination.

¶ 46    Alex's second contention on appeal is that the trial court erred in revoking his power of attorney for healthcare on April 21, 2021, and appointing Ileana and Adolf as Grace's plenary co-guardians. At the outset, Adolf argues that the trial court's April 2021, order was immediately appealable under Rule 304(b) and that this court lacks jurisdiction to address the issue. We agree. The trial court's April 2021 order finally determined Alex's right to act as power of attorney for Grace's healthcare. As it was an order entered in a guardianship proceeding that finally determined a right of a party, it was immediately appealable under Rule 304(b)(1), and we lack jurisdiction to address this claim. See, *e.g.*, *In re Estate of Russell*, 372 Ill. App. 3d 591, 593 (2007) (removal of a trustee was analogous to the change of an estate's executor for purposes of creating an appealable order under Rule 304(b)(1)); see also *In re Neuf's Estate*, 85 Ill. App. 3d 468, 469 (1980) ("[A]n order granting or denying removal of a conservator should be regarded as a final determination of a right or status within the meaning of Rule 304(b)(1).").

¶ 47    Alex's third contention on appeal is that the trial court abused its discretion in denying his petition to terminate Grace's Irrevocable Trust or to remove Adolf as trustee and/or compel partial liquidation.

¶ 48    A trial court's authority to reform a trust should be exercised with great caution. *Department of Mental Health and Developmental Disabilities v. Phillips*, 114 Ill. 2d 85, 91 (1986). "[A] court will allow reformation of a trust when an unforeseen exigency arises which may place the *cestui que trust* in "pinching want," making it necessary for the court to place itself in the position of the settlor and carry out [her] intention as if [she] had anticipated the changed circumstances." *Id.* Further, the trial court has the power to liquidate a trust and distribute the proceeds to the beneficiaries if it will further the purposes of the trust. 760 ILCS 3/412 (West 2020). Finally, a trial court has "inherent powers to remove a trustee for breach of trust,

misconduct, or disregard of his fiduciary duties." *Laubner v. JP Morgan Chase Bank, N.A.*, 386 Ill. App. 3d 457, 467 (2008). However, this is an extreme remedy and not every instance of mistake or neglect requires removal of a trustee. *Id.* "The court should remove a trustee only if the trustee endangers the trust fund and removal is clearly necessary to save the trust." *Id.* A trial court's refusal to remove a trustee will not be disturbed absent an abuse of discretion. *In re Estate of Mercier*, 2011 IL App (4th) 110205, ¶ 14. A trial court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *In re Marriage of Iqbal & Khan*, 2014 IL App (2d) 131306, ¶ 44.

¶ 49    Upon review of the record, we cannot say the trial court abused its discretion in denying the petition to terminate the trust, to remove Adolf as trustee, or to compel partial liquidation. As to terminating the trust, at the start of the hearing Adolf stated that, if the trial court was actually considering terminating the trust, then all the beneficiaries needed to be notified so that they could be heard on the issue. Alex agreed that it would be appropriate to have all the beneficiaries present. As such, the parties agreed that terminating the trust was not appropriate at that time. Accordingly, denying the request to terminate the trust was not an abuse of discretion.

¶ 50    As to removing Adolf as trustee, we note that Alex's assertions in the petition and his arguments at the hearing were essentially that Adolf had abused his powers as trustee of the irrevocable trust through his sale of the Swift Road property and the resulting decrease in the trust's income. At the hearing, Adolf explained that zoning violations prompted the sale of the Swift Road property and that reinvesting the proceeds was necessary to preserve the trust and avoid capital gains taxes. He also explained that the decrease in trust income was because it took time to evict all the tenants on the Swift Road property and prepare the property for sale. Further, when he purchased the new investment properties it took time to complete renovations and get all the

units under lease. Adolf stated that the income of the trust was returning to more normal levels. Based on Adolf's explanations, the trial court determined that Adolf had not mismanaged the irrevocable trust or acted in bad faith. As this was a reasonable conclusion based on the arguments presented, we cannot say the trial court abused its discretion in denying the request to remove Adolf as trustee. *Id.*

¶ 51 Alex next argues that the trial court erred in refusing to compel partial liquidation of the irrevocable trust because Grace's estate plan could not sustain itself unless the trust consistently produced six-figure income and, since the sale of the Swift Road property, the trust income had fallen short. However, the record does not indicate that Alex ever insisted on an evidentiary hearing where he could provide evidence to the trial court that there were no means left to provide for Grace's care absent liquidating Grace's real estate held in her trusts. As the arguments of the parties indicated that there were possibly other assets and that the income from the irrevocable trust was improving, we cannot say that the trial court abused its discretion in failing to order partial liquidation.

¶ 52 Alex's final contention on appeal is that the trial court erred in entering orders on May 25 and July 15, 2021, requiring him to personally pay for Grace's caregiver and other expenses and for Ileana's attorney fees incurred in the case. At the outset, Adolf argues that we lack jurisdiction to address these arguments as these orders were immediately appealable under Rule 304(b) because they were orders that finally determined a right or status of a party in a guardianship proceeding. We disagree with Adolf's contention because these orders did not *finally* determine any of Alex's rights. The May 2021 order required Alex to pay Grace's expenses "until further order of the court" and the July 2021 order indicated that the payment of Grace's expenses and the

attorney fees was "subject to possible reallocation of the court." Accordingly, the orders were not immediately appealable and we do not lack jurisdiction under Rule 304(b).

¶ 53   Nonetheless, we conclude that we lack jurisdiction because the orders at issue were not final orders. Illinois Supreme Court Rule 303 provides, "The notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from ***." Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). "A final order is one that 'resolve[s] every right, liability or matter raised.' " *Goral v. Kulys*, 2014 IL App (1st) 133236, ¶ 22 (quoting *Marsh v. Evangelical Covenant Church of Hinsdale*, 138 Ill. 2d 458, 465 (1990)). Here, the orders at issue were not final orders as they were "subject to possible reallocation" by the trial court. *Griffin v. Prairie Dog Limited Partnership*, 2019 IL App (1st) 173070, ¶ 114 ("An order that leaves a cause still pending and undecided or leaves matters regarding the ultimate rights of the parties for future determination is not a final order."). The wording of the trial court's orders shows an intent on the part of the trial court to revisit the issue of whether Alex is required to personally pay Grace's expenses from sources other than her own income. There is no indication that the trial court will not entertain another petition by Alex. Accordingly, we lack jurisdiction under Rule 303.

¶ 54                                          III. CONCLUSION

¶ 55   For the reasons stated, we affirm in part and dismiss in part.

¶ 56   Affirmed in part and dismissed in part.